166 P.3d 961

LAEROC WAIKIKI PARKSIDE, LLC, a
Hawai'i limited liability company,
Plaintiff–Appellant

v.

K.S.K. (OAHU) LIMITED PARTNER-
SHIP, a Hawai'i limited partnership;
Kenchiku Shiryo Kenkyusha, Limited, a
Japan corporation, as general partner of
K.S.K. (Oahu) Limited Partnership;
Condotech's Hawaiiana Resorts, Inc., a
Hawai'i corporation; Jay C. Bloom;
Fred Izutsu; and Glenn Nakamura, De-
fendants–Appellees

and

Hospitality Investment Advisors, LLC
a.k.a. Horwath Hospitality Investment
Advisors, LLC and Horwath Investment
Advisors, LLC, a Delaware limited lia-
bility company, and DOES 1–10, Defen-
dants (Civ. No. 02–1–2013)

Resortquest Hawaii, LLC dba Aston Hotel
& Resorts Hawaii, a Hawai'i limited lia-
bility company, formerly known as Ho-
tel Corporation of the Pacific, Inc. dba
Aston Hotels & Resorts Hawaii, a Ha-
wai'i corporation, Plaintiffs–Appellees

v.

Laeroc Waikiki Parkside, LLC, a Hawai'i
limited liability company, Defendant–
Appellant

and

Does 1–50, Defendants

Laeroc Waikiki Parkside, LLC, a Hawai'i
limited liability company, Third–
Party Plaintiff–Appellant

v.

K.S.K. (OAHU) Limited Partnership, a Ha-
wai'i limited partnership; Kenchiku
Shiryo Kenkyusha, a Japan corporation;
Condotech's Hawaiiana Resorts, Inc., a
Hawai'i corporation; Jay C. Bloom;
Fred Izutsu; and Glenn Nakamura,
Third–Party Defendants–Appellees (Civ.
No. 02–1–2695)

Laeroc Waikiki Parkside, LLC, a Hawai'i
limited liability company, Plaintiff–
Appellant

v.

Hotel Corporation of the Pacific, Inc., dba
Aston Hotel & Resorts Hawaii, a Ha-
wai'i corporation, Defendant–Appellee

and

Does 1–10, Defendants (Civ.
No. 03–1–1036).

No. 27583.

Supreme Court of Hawai'i.

Aug. 31, 2007.

Glenn K. Sato for plaintiff/defendant/third-party plaintiff-appellant Laeroc Waikiki Parkside, LLC.

Lissa H. Andrews and Devon Peterson (Rush Moore LLP), Honolulu, for defendants/third-part defendants-appellees Jay C. Bloom, Fred Izutsu, and Glenn Nakamura.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Plaintiff/Defendant/Third–Party Plaintiff–Appellant Laeroc Waikiki Parkside, LLC (Appellant) appeals from the November 14, 2005 final judgment of the circuit court of the first circuit (the court) [1] in favor of Defendants/Third–Party Defendants–Appellees Jay C. Bloom (Bloom), Fred Izutsu (Izutsu), and Glenn Nakamura (Nakamura) [collectively, Appellees] and against Appellant as to all claims and causes of action in the second amended complaint filed on May 9, 2003 (the Complaint) in Civ. No. 02–1–2013 [hereinafter C2013] and the third party complaint filed on June 4, 2003 in Civ. No. 02–1–2695

---

1. The Honorable Victoria S. Marks presided.

[hereinafter C2695] relating to Appellant's Purchase Agreement (Purchase Agreement or Agreement) of the Waikiki Parkside Hotel (the Hotel). The Complaint alleged breach of contract in Count I, breach of fiduciary duties in Count II, misrepresentation in Count III, nondisclosure in Count IV, indemnification in Count V, punitive damages in Count VI, and declaratory and injunctive relief in Count VII.

Appellant also challenges (1) as to the Complaint, the court's (a) May 12, 2004 order granting in part and denying in part Appellees' motion for summary judgment with respect to Counts I, II, III, IV, V, and VI and the joinder in Appellees' said motion by Defendants–Appellees K.S.K. (Oahu) Limited Partnership (KSK) and Kenchiku Shiryo Kenkyusha; (b) the May 19, 2005 order denying Appellant's motion for reconsideration of the court's February 16, 2005 oral grant of partial summary judgment; (c) the May 19, 2005 order denying Appellant's motion for partial summary judgment filed on March 22, 2005; and (d) the May 26, 2005 order granting in part and denying in part the motion for summary judgment filed by Defendant–Appellee Condotech's Hawaiiana Resorts, Inc. (Hawaiiana) and Appellees on Counts I, II, III, IV, V, and VI; and (2) as to the third party complaint, the October 19, 2005 order granting in part and denying in part Hawaiiana and Appellees' motion for partial summary judgment. The court did not express any specific reasons for granting summary judgment in any of the above orders or in the November 14, 2005 final judgment.

## I.

We hold, as to:

(1) the court's May 12, 2004 order of summary judgment, that there was no genuine issue of material fact to controvert that Appellees were not parties to the Agreement inasmuch as they are plainly identified in and acted as the seller's agents in the sale of the Hotel;

(2) the court's May 26, 2005 order of summary judgment, that (a) judicial estoppel and Appellees' status as non-parties to the Agreement did not preclude them from raising the Nonrecourse Provision (Nonrecourse Provision or ¶ 8.2 of the Agreement) exempting Appellees from liability except for "fraud, willful misconduct or criminal misconduct" as a defense; (b) Appellant failed to produce allegations that satisfy the prima facie test for the tort of fraudulent inducement; (c) the Nonrecourse Provision expressly excludes fraud and willful misconduct from its scope; (d) Appellant failed to substantiate that any such fraud or willful misconduct existed here; and (e) Appellant's breach of fiduciary duty claims do not constitute fraud or willful misconduct, and therefore are subject to the Nonrecourse Provision;

(3) the May 19, 2005 orders, that based on the reasons in the preceding paragraph, the court was correct in denying Appellant's motions for reconsideration and partial summary judgment because Appellees were entitled to summary judgment as a matter of law;

(4) the October 19, 2005 order, that (a) for the same reasons, the court correctly granted Appellees' motion for summary judgment on Appellant's Third–Party complaint in C2695 and (b) because the Nonrecourse Provision covers Appellant's claims for breach of fiduciary duty, summary judgment was also appropriately granted as to Appellant's claim for contribution arising out of Appellant's settlement agreement with Plaintiff–Appellee Resortquest Hawaii, LLC dba Aston Hotel & Resorts Hawaii (Aston); and

(5) other arguments presented, that Appellant fails to raise meritorious claims.

## II.

Prior to 2001, KSK owned the Hotel. Hawaiiana managed the Hotel for KSK.

In 1988, Izutsu became the general manager and oversaw the daily operations of the Hotel.

In May 1992, Izutsu began to report to Bloom, who had become the vice president and chief operating officer of Hawaiiana. In 1992, Nakamura also began working at the Hotel, and in 1999 he became chief engineer.

Starting in 1988, Izutsu held staff meetings with department heads at the Hotel and kept

minutes of the weekly meetings (the Minutes). Copies of the Minutes were given to Bloom and were stored in boxes in a storage room at the Hotel. Appellant claims that Izutsu admitted the Minutes were a good starting point for anyone who wanted to know what happened at the Hotel. Appellant also claims that the Minutes are authentic and fall within an exception to the hearsay rules under Hawai'i Rules of Evidence (HRE) Rule 803(b)(6) (1993 & Supp 2006).[2] Appellees do not challenge this contention.

Appellant contends the Minutes reflected that from at least 1992, the chilled water pipes for the air conditioning system in the Hotel (CWPs) had failed and allowed condensation to form within the wall cavities, causing mold to grow throughout the Hotel. Appellant further claims that the Minutes show water came through the windows and sliding glass doors, causing mold to expand behind the wallpaper, in guest rooms, and in other corridors of the Hotel.

In 1992, KSK renovations to the Hotel included re-insulation of the CWPs for the air conditioning system in the Hotel, replacement of the Hotel's wall coverings, and treatment of the walls for "mildew."

In the March 24, 1994 Minutes, it was reported that "[h]ydrochloric acid was used to unclog the pipes, causing strong odors. Engineering will schedule clearing of all vertical pipes during low occupancy."

Appellant contends the Minutes show that from at least late November 1996, mold was present and had to be cleaned from the air conditioning grills, the walls below the grills, and condensers within the guest rooms. Appellees point out that from 1996 to July 2001, when the Hotel was sold to Appellant, there were approximately 286 different reports of the weekly managers' meetings. Of these 286 reports, Appellant was only able to find ten instances where references were made to mold or mildew.

Appellant alleges that a letter dated April 11, 1997, which it refers to as the "Ferris Report," from Ferris & Hamig Hawaii, Inc., mechanical engineers (Ferris), to Art Suverkrupp (Suverkrupp), the Hotel's then-chief engineer, demonstrates that "the water chilling system in the Hotel was in 'poor' condition and recommended that the water chiller should be replaced and 'damaged piping insulation' should be repaired." Appellees answer that the Ferris Report "is nothing more than an incomplete, one page letter ..." which is undermined by "other documents in Appellant's possession [which] clearly establish that major work ... was done to the HVAC system after 1997." Appellees further contend that the Ferris Report is not admissible evidence because it is an incomplete document and is speculative as to what the author was attempting to state in the document. Appellees objected to the consideration of this document by the court.[3]

On May 14, 2001, prior to the signing of the Agreement, Aston and Appellant sent a due diligence check list (Hospitality Fax) to Bloom through a facsimile from Hospitality Investment Advisors, KSK's broker. The Hospitality Fax stated, "Attached are lists of items that [Appellant] and Aston will be requesting while conducting their due diligence at [the Hotel]. This advanced notice will give [Izutsu] an opportunity to expedite the process and minimize the disruption to his staff." Bloom responded and advised Appellant that, consistent with the Agreement, it was Appellant's duty to conduct its own due diligence and the seller would not "guess at

---

**2.** HRE Rule 803(b)(6) states in relevant part:

> **Rule 803 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
> (b) Other exceptions.
> . . . .
> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in

the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

**3.** This point is not raised on appeal.

what documents fit in what category of the list requested by [Appellant]."

On June 1, 2001, KSK, as seller, and Appellant, as buyer, entered into the Purchase Agreement. As noted before, Hawaiiana managed the hotel for KSK. Bloom, as vice-president and chief operating officer, Izutsu, as the general manager of the Hotel, and Nakamura, as chief engineer, were employees of Hawaiiana and were described in the Agreement as "Seller's Representatives."[4]

The Purchase Agreement provides that "[w]ithin five (5) days after the Contract Date, [June 1, 2001, KSK] will provide [Appellant], at the hotel, with access to all books, records, and other documents concerning or related to the Hotel, to the extent in the possession of [KSK], any [KSK's] Affiliate, any consultant of [KSK], or [KSK's] Managing Agent." The Purchase Agreement addi-

tionally provides a due diligence period of twenty days, beginning on the contract date, during which Appellant could inspect the physical premises of the Hotel, and all the records regarding the Hotel.[5]

Further, an "As–Is" clause in Article 8, ¶ 8.2 of the Agreement states that Appellant, as purchaser, would be "without recourse or warranty except those expressly set forth" therein.[6] Paragraph 8.2 also contains a Non-recourse Provision which states that Appellant has no recourse against any agent or partner of the Seller except for claims arising from "fraud, willful misconduct, or criminal acts[,]" and that the sole recourse was against Seller and was limited to sale proceeds paid to Seller.[7] Article 6, ¶ 6.8 provides a limited representation concerning the physical condition of the Hotel to the effect that, "[t]here are no structural or mechanical

4. Article 1 of the Purchase Agreement, entitled "Definitions," states in relevant part:

> *Seller's Representatives.* "*Seller's Representatives*" *shall mean Jay C. Bloom, an individual, in his capacity as the authorized representative of Seller* and in his capacity as President of Seller's Managing Agent ... *and Fred Izutsu,* an individual, in his capacity as general manager of the Hotel, and as an employee of Seller's Managing Agent. "*Seller's Representatives*" *shall also mean Glenn Nakamura,* an individual, in his capacity as the chief engineer of the Hotel, to the extent warranties and representations in Article 6 of this Agreement are within the scope of his job responsibilities and within his capacity given his education and experience.

(Emphases added.)

5. Article 5, ¶ 5.2 of the Agreement states in relevant part:

> *Right to Inspection.* During the Due Diligence Period, *Purchaser, with the cooperation of Seller, shall have the right to* have its consultants, surveyors, engineers, employees, contractors, prospective financing sources, and agents *inspect all aspects of the Property,* including the physical condition of the Real Property and the Tangible Property, the Consumables, and the Operating Supplies, all environmental aspects of the Real Property, all aspects of the Bookings, Deposits and Reimbursements, Deposits for Bookings, Intangible Property, Licenses and Entitlements and Software Programs; provided that Purchaser's inspections shall not unreasonably interfere with the operation of the Hotel. Purchaser shall have the right to conduct, with Seller's designated agents present, such inventories of Personal Property as Purchaser shall desire. Purchaser shall also have the right to interview

Employees (but not to inspect Employee files and records), examine records and files whether in written form or contained in any electronic storage media, speak with the accountants for the Hotel, and conduct such other inquiries as Purchaser in its sole discretion may deem appropriate. *Purchaser shall be given complete access to all information requested by Purchaser and in Seller's possession or with reasonable effort by Seller obtainable for Purchaser's review.*

(Emphases added.)

6. Article 8, ¶ 8.2 of the Agreement states in relevant part:

> "*As–Is*". Purchaser acknowledges that the *sale of the Property, including the Hotel, is made on an "AS–IS" basis* and without recourse or warranty except those expressly set forth herein.

(Emphasis added.)

7. Article 8, ¶ 8.2 further states in relevant part:

> *Purchaser further acknowledges that Purchaser shall not have recourse against any agent or partner of Seller,* or the officers or directors of the partners of Seller, or the personal assets of any partner of Seller with respect to any default under this Agreement or any document executed in connection therewith, *or Seller's agents or attorneys, except where such claim, demand or cause of action results from any fraud, willful misconduct, or criminal acts of Seller,* or such officers directors, partners, attorneys or agents, *and that Purchaser's sole recourse shall be against Seller and shall be limited to the sale proceeds paid to Seller as specified in this Agreement.*

(Emphases added.)

defects in the Improvements which unreasonably interfere with or prevent the operation of the Hotel as presently conducted." Further, Article 6, ¶ 6.16 provides that the Seller would not make "any untrue statement of a material fact, or . . . omit a material fact necessary to make the statements contained therein not misleading." [8]

Shortly after the Purchase Agreement was signed on June 1, 2001, Peter Morgan (Morgan), Executive Vice President for Appellant, traveled to the Hotel to conduct the due diligence. He was given a tour of the Hotel which included specific areas where operations were conducted and records were kept. Morgan was also introduced to the managers of the various departments and department heads were advised to provide Morgan with any information he requested. Appellant contends Morgan was not given the Minutes or the Ferris Report as the Hospitality Fax requested, and as the Purchase Agreement required. Appellees maintain that Appellant had full access to all records and all employees in the Hotel during the due diligence period, and it was Appellant's obligation under the Agreement to ask to see categories of documents such as maintenance records, financial records, and records of how the Hotel was run.

On July 17, 2001, Certified Environments Inc. (CEI), an engineering firm, completed a property condition report of the Hotel (CEI Report) for City Bank. At that time, City Bank was considering making a loan to Appellant to purchase the Hotel. According to Appellees, "[n]o mold was observed by CEI and the findings in the CEI Report were consistent with the representations by KSK in the [Agreement]."

For several months prior to the close of sale of the Hotel by KSK to Appellant on August 24, 2001, Aston and Appellant had been negotiating the terms of a management contract. Under this contract, Aston would manage the Hotel for Appellant upon closing of the sale. However, Aston and Appellant were not able to reach agreement on the terms of the management contract prior to the closing. Thus, Appellant requested that Hawaiiana remain as manager on a temporary basis until Appellant could find a permanent property manager. On August 24, 2001, Hawaiiana agreed to manage the Hotel for Appellant under the terms and conditions of the Hawaiiana Management Agreement (Hawaiiana Agreement).

Hawaiiana managed the Hotel until Appellant and Aston entered into the Waikiki Parkside Management Agreement (Aston Agreement) dated December 6, 2001, which became effective December 17, 2001.

On December 12, 2001, Aston's maintenance chief, Chris Banks (Banks), toured the property with Nakamura. Banks testified that during the tour Nakamura voluntarily provided him with photographs of areas Nakamura thought should be looked at by Banks. The photographs contained titles written by Nakamura. For example, photograph no. 13, entitled "RISERS NEED RELAGGING," [9] is of the wall and floor of a guest room with a dark water stain. Appellees contend that Aston was given these photographs five days prior to the effective date of the Aston Agreement and knew there was a possibility the risers would need reinsulating, yet did nothing to address the issue with Appellant prior to the effective date of the Aston Agreement.

After Appellant began repair work on the Hotel, it claims that its consultants determined there was widespread mold infestation and recommended that Appellant remove and replace substantially all of the Hotel's interior. According to Appellant, as of October 28, 2004, the total project repair and

8. Article 6, ¶ 6.16 of the Agreement states:
 *Full Disclosure.* No representation or warranty of Seller in this Agreement, or in any information, statement, or certificate furnished or to be furnished by or on behalf of Seller pursuant to this Agreement or in connection with the transactions contemplated hereby, *contains or shall contain any untrue statement of a material fact, or omits or shall omit a material fact necessary to make the statements*

*contained therein not misleading.* The Disclosure Information provided to Purchaser or to which access is being provided to Purchaser is complete and accurate.
 (Emphasis added.)

9. According to Appellant, the words "risers need relagging" mean that the chilled water pipes risers need re-insulation.

renovation costs for the Hotel were $16.2 million.

On July 25, 2002, Aston's Gary Ettinger (Ettinger) sent an email to Kelvin Bloom of Aston which stated, "In my ever so humble opinion, there is absolutely no way that Hawaiiana didn't know when they sold, and it would be highly unlikely that [Morgan] couldn't have had some peripheral knowledge if not specific knowledge." In a further letter dated August 2, 2002, Aston's counsel wrote, "Investigations reveal that Hawaiiana, the prior owners/managers, and LaeRoc's agent, had evaluated the HVAC system and had concluded the entire system needed to be replaced.... There is also ample evidence that the deteriorated condition of the insulation on the chilled-water lines was a known defect."

Appellant's mechanical engineering expert, William Ivey, testified that in August 2002 he observed that the insulation on the HVAC system was failing and that mold was growing around the fiberglass insulation around the CWPs. Appellees contend that Ivey only observed these conditions after the drywall covering the CWPs was removed and the pipes were exposed. Ivey stated that he was able to see these conditions because "[Appellant] had opened up the drywall in the location of the chilled water risers in 13 rooms, [and] taken the drywall off in order to examine the condition of the insulation." Appellees further assert that when "[Ivey] conducted his initial inspection, he looked at the fan coil units within 13 rooms which had been selected by Appellant. When he inspected the area of the rooms where the fan coil units are housed, he did not see any mold."

Appellant responds that Appellees misstated Ivey's testimony and when Ivey testified in regard to finding mold during his initial inspection, he said, "Well, I took some pictures up there, but I, at that time, wasn't looking for mold, so I didn't see any mold. But now that I go back and look at my pictures, in some of them, there is some mold, what appears to be mold in that area."

On August 20, 2002, Morgan taped a telephone conversation with Izutsu regarding the Hotel. Appellant contends that this conversation is indicative of Appellees' misrepresentations and non-disclosures. The recorded telephone conversation between Morgan and Izutsu is, in part, as follows.

P [MORGAN]: And on the chilled water pipes, did the chilled water pipes ever leak?

F [IZUTSU]: The chilled water pipes, umm, certain units that may from time to time and what they did was open them up and umm, they umm, they insulated it, and then put it back[.]

P: So, before we bought the hotel, you told me that there, that the air conditioning system was working fine[.]

F: It was, but you know the leaks do happen from room to room[.]

P: So, did the leaks happen after we bought it[?]

. . . .

F: [I] don't re-call any leaks after you folks bought it[.]

P: Were there any leaks before we bought it?

F: Ahh, yes there were[.]

P: You and [Nakamura] never told me anything about that[.]

F: (silence—2 seconds)

. . . .

Appellees contend that this reference to the conversation is misleading because Izutsu's silence was due to the fact that he had answered this question previously in the conversation. Appellees cite an earlier portion of the conversation as follows:

P [MORGAN]: ... [D]o you have a quick second for me?

F [IZUTSU]: Sure[.]

P: Thank you. You know we are working with Aston on a couple of things here, umm, one has to do with roof, umm, before we bought the hotel you told me that the roof did not leak. Do you remember that?

F: Umm, no[.]

P: Did the roof ever leak?

F: Yes, it was because, remember the 11th floor had umm, had umm, water coming through.

P: No, I don't remember you ever telling me, or showing me the roof on the 11th floor[.]

F: (2 SECOND SILENCE) Umm, (pause) . . .

P: Where else did it leak?

F: It, umm, umm, in the umm, meeting room[.]

P: You never told me about that[.]

F: Umm, I thought I told you. I thought I mentioned all those things to you[.]

Appellant, in its reply brief, explains that this discussion is related to the CWP leaks. Appellees contend that "Appellant selectively quotes from the transcript of its secretly[-]recorded conversation and misstates the substance of the conversation to this [c]ourt."

On September 10, 2002, Appellant submitted its first amended complaint against KSK, Hawaiiana, and Appellees [hereinafter collectively Defendants] in C2013.

Aston operated the Hotel for Appellant until the Hotel was closed for repairs and renovations in February 2003. In April 2003, Aston was terminated as a result of an ongoing dispute between Appellant and Aston regarding the monetary terms of the Aston Agreement.

On May 9, 2003, Appellant filed its Second Amended Complaint. Appellant alleged that Appellees, as KSK's representatives, concealed and/or did not disclose that the Hotel's air conditioning system was leaking, needed replacement, and was causing mold to infest many areas of the Hotel. As further support, the Complaint alleged that the Hotel roof was leaking, many of the areas of the Hotel were infested with termites, and

concrete spall [10] existed on and/or under the roof.

On February 6, 2004, Morgan stated that if Izutsu and Nakamura had given him the minutes, the Ferris Report, and disclosed the condition of the Hotel, Morgan would have retained consultants to examine the Hotel's latent defects. According to Appellant, upon knowing the extent of such latent defects, Morgan would have recommended to Appellant that the Hotel should not be purchased.

Appellees filed three motions for summary judgment on July 16, 2003, December 10, 2004, and July 1, 2005. By orders dated May 12, 2004, May 26, 2005, and October 19, 2005, the court granted Appellees' Motions for Summary Judgment on all of Appellant's claims set forth in the Second Amended Complaint in C2013 [11] and Third–Party Complaint in C2695.[12]

On March 22, 2005, Appellant filed a motion for partial summary judgment. On March 23, 2005, Appellant filed a motion for reconsideration. By orders dated May 19, 2005, the court denied both Appellant's reconsideration and partial summary judgment motions.

### III.

On appeal, Appellant contends that (1) with regard to the May 12, 2004 Order, "[t]he [court] should have denied Appellees summary judgment on Count I because the Agreement is ambiguous as to whether Appellees were parties to the Agreement; therefore a genuine issue of material fact exists as to the intent of the parties to the Agreement," (2) with regard to the May 26, 2005 Order "[t]he [court] should have denied Appellees summary judgment upon Appellant's claims in Count I through VI because

10. A "spall" is "a small fragment broken from the face or edge of a material (as stone, metal, concrete, glass, or a ceramic product) and having at least one featheredge[.]" *Webster's Third New International Dictionary* 2181 (1961)

11. Civil No. 02–1–2013 (C2013) is the civil suit denominated, as set forth *supra*, as Laeroc Waikiki Parkside, LLC, a Hawai'i limited liability company vs K.S.K. (Oahu) Limited Partnership, a Hawai'i limited partnership; Condotech's Hawaiiana Resorts, Inc., a Hawai'i corporation; Jay C. Bloom; Fred Izutsu; Glenn Nakamura;

Hospitality Investment Advisors, LLC, a Hawai'i limited liability company; and Does 1–10

12. Civil No. 02–1–2695 (C2695) is the civil suit denominated, as set forth *supra*, as Resortquest Hawai'i, LLC dba Aston Hotels & Resorts Hawai'i, a Hawai'i limited liability company, formerly known as Hotel Corporation of the Pacific, Inc. dba Aston Hotels & Resorts Hawai'i, a Hawai'i corporation vs Laeroc Waikiki Parkside, LLC, a Hawai'i limited liability company; and Does 1–50.

genuine issues of material facts exist regarding Appellant's claims" in so much as, (a) "[b]y application of judicial estoppel, Appellees could not take the position that they were parties to the Agreement and Appellees were not third-party beneficiaries of the Agreement, accordingly Appellees could not enforce the Nonrecourse Provision against Appellant and the [court] should have denied Appellees summary judgment upon Counts I through VI", (b) "[s]ince Appellees fraudulently induced Appellant into the Agreement, the Nonrecourse Provision is unenforceable against Appellant and the [court] should have denied Appellees summary judgment upon Counts I through VI," (c) "[s]ince public policy forbids the inclusion of fraud and other wilful misconduct in exculpatory/limitation of damages provisions, the Nonrecourse Provision cannot immunize Appellees from Appellant's fraud and willful misconduct claims in Counts II through VI," (d) "[s]ince the Nonrecourse Provision fails to refer to tort and willful misconduct claims, expressly excludes 'fraud, willful misconduct or criminal acts[,]' and expressly limits its application 'to any default under this Agreement or any document executed in connection therewith,' the Nonrecourse Provision does not immunize Appellees from Appellant's fraud and willful misconduct claims in Counts II through VI," and (e) "[s]ince the Nonrecourse Provision fails to refer to Appellees' fiduciary relationships with Appellant as Appellant's sub-agents, the Nonrecourse Provision does not immunize Appellees from Appellant's breach of fiduciary duty claims in Counts II and V," (3) with regard to the May 19, 2005 Order, "[f]or all the reasons set forth immediately above, the [court] should have granted Appellant's motions for reconsideration and partial summary judgment," and (4) with regard to the October 19 Order, "[f]or all the reasons set forth immediately above, the [court] should have denied Appellees' motion for summary judgment upon Appellant's claims against Appellees in Appellant's Third–Party Complaint in C2695 and, in addition, since the Nonrecourse Provision fails to refer to Appellees' fiduciary relationships with Appellant as Appellant's sub-agents, the Nonre-

course Provision does not immunize Appellees from Appellant's claim for contribution arising out of Appellant's settlement with Aston."

## IV.

"On appeal, the standard of review for the granting of summary judgment is identical to that applicable to the trial court's consideration of the motion." *Lansdell v. County of Kaua'i,* 110 Hawai'i 189, 194, 130 P.3d 1054, 1059 (2006) (citation omitted). " 'Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied.' " *Id.* (quoting *Beamer v. Nishiki,* 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983)) (other citation omitted).

Thus, " '[a]n award of summary judgment is reviewed *de novo* under the same standard applied by the circuit court.' " *Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc.,* 114 Hawai'i 37, 46, 155 P.3d 1138, 1147 (2007) (quoting *French v. Hawai'i Pizza Hut, Inc.,* 105 Hawai'i 462, 466, 99 P.3d 1046, 1050 (2004) (other citations omitted)). It is well settled that "[s]ummary judgment is appropriate where there is no genuine issue as to the material fact and the moving party is entitled to judgment as a matter of law. All evidence and inferences must be viewed in the light most favorable to the non-moving party." *French,* 105 Hawai'i at 466, 99 P.3d at 1050 (internal quotation marks and citations omitted). " 'A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.' " *Taniguchi,* 114 Hawai'i at 46, 155 P.3d at 1147 (quoting *Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (other citation omitted)).

## V.

Appellees assert that because Appellant does not comply with Hawai'i Rule of Appellate Procedure (HRAP) Rule 28(b)(3) (2007)[13] in failing to append copies of the

**13.** HRAP Rule 28(b) states in relevant part:

Within 40 days after the filing of the record on

orders relevant to its points on appeal, Appellant's appeal should be dismissed. HRAP Rule 30 (2007) states that "[w]hen the brief of an appellant is otherwise not in conformity with these rules, the appeal *may* be dismissed or the brief stricken and monetary or other sanctions *may* be levied by the appellate court." [14] (Emphases added.)

In light of the discretion granted by HRAP Rule 30, Appellant's appeal need not be dismissed. *See Morgan v. Planning Dep't, County of Kauai,* 104 Hawai'i 173, 180–81, 86 P.3d 982, 989–90 (2004) (observing that non-compliance with HRAP Rule 28(b)(4) "offers sufficient grounds for the dismissal of the appeal," but recognizing that this court "has consistently adhered to the policy of affording litigants the opportunity to have their cases heard on the merits, where possible." (Internal quotation marks and citations omitted.)) Appellees do not claim prejudice.

## VI.

■ Appellant argues that because KSK did not file a motion for summary judgment to enforce the Nonrecourse Provision against Appellant and on February 10, 2005, filed a "No Opposition" to Appellees' December 10, 2004 motion, KSK did not seek to enforce the Nonrecourse Provision against Appellant. Appellant cites no authority, presents no analysis as to this argument, and does not explain the relevance of KSK not filing a motion for summary judgment. Because Appellant presents no discernible argument, this court does not consider this contention. *See State v. Bui,* 104 Hawai'i 462, 464 n. 2, 92 P.3d 471, 473 n. 2 (2004) ("Inasmuch as Defendant 'presents no discernable argument in support of this contention[,] . . . it is our

prerogative to disregard this claim.'" (Quoting *State v. Moore,* 82 Hawai'i 202, 206, 921 P.2d 122, 126 (1996).)).

## VII.

As to Appellant's issue (1), Appellant contends that summary judgment should have been denied because the Purchase Agreement is ambiguous as to whether Appellees were parties to the Agreement and therefore a genuine issue of material fact exists. Appellant argues that, "[s]ince Appellees are expressly identified in and evidence exists that Appellees agreed to perform the disclosure obligations under the Agreement, Appellees intended to be bound by such obligations under the Agreement."

## VIII.

■ It is well-settled that "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Corps Constr., Ltd. v. Hasegawa,* 55 Haw. 474, 476, 522 P.2d 694, 695 (1974) (quoting Restatement (Second) of Agency § 320 (1958) (other citations omitted)).

In that case, the complaint alleged that the plaintiff performed excavation work pursuant to a request from defendant Hasegawa, a real estate agent, on behalf of defendant Enos Realty, and the plaintiff was never paid for the work it performed. *Id.* at 475, 522 P.2d at 694. At trial it was determined that Hasegawa did not request the work for himself, but served as an "in-between man" for Enos. *Id.* at 475, 522 P.2d at 695. This court reasoned that, "[g]iven the unambiguous form of Hasegawa's request, the plaintiff's

___

appeal, the appellant shall file an opening brief. . . . There shall be appended to the brief a copy of the judgment, decree, findings of fact and conclusions of law, *order,* opinion or decision relevant to any point on appeal, unless otherwise ordered by the court. (Emphasis added.)

14. Appellees cite *Hong v. Kong,* 67 Haw. 15, 15, 675 P.2d 769, 770 (1984) (where appellants' opening brief did not have the findings of fact and conclusions of law appended, nor did the brief quote the findings and conclusions complained of in the points of error, the court struck

the brief, explaining, "[Hawai'i Supreme Court Rule (HSCR)] Rule 3(b) is designed so that briefs filed in compliance therewith will show clearly that there is appellate jurisdiction, what the rulings being appealed are, what the questions of law presented are, what the standard or standards of review are, and what the record reflects[,]" and "in all cases of substantial non-compliance with HSCR Rule 3(b), whether by appellants or appellees, sanctions up to and including dismissal of the appeals will be levied[]"), as support for this argument.

work in compliance at best gave rise to a contract, implied in fact, with Enos[.]" *Id.* at 476, 522 P.2d at 695 (citations omitted).

In *Pancakes of Hawaii, Inc. v. Pomare Props. Corp.*, 85 Hawai'i 300, 944 P.2d 97 (App.1997), the Intermediate Court of Appeals (ICA) explained that the law regarding agents and the contracts entered into by their principals is "well settled," and quoted comments from Restatement (Second) of Agency § 320 indicating that only an agent who *explicitly manifests* an intention to become a party to a contract will be made a party.

> Whether or not a person purporting to act as agent for another person becomes a party to the contract depends upon the agreement between such person and the other party.... [A] principal is disclosed if, at the time of making the contract in question, the other party to it has notice that the agent is acting for a principal and of the principal's identity. *One who purports to contract on behalf of a designated person does not manifest by this that he [or she] is making a contract on his [or her] own account, and only where he [or she] so manifests does the agent become a party to a contract [that] he [or she] makes for the principal. In absence of other facts, the inference is that the parties have agreed that the principal is, and the agent is not, a party.*

*Id.* at 308–09, 944 P.2d at 105–06 (App.1997) (ellipses and brackets in original) (quoting Restatement (Second) of Agency § 320 cmt. a, at 67) (emphasis added).

"When reviewing the court's interpretation of a contract, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Mikelson v. United Servs. Auto. Ass'n*, 107 Hawai'i 192, 197, 111 P.3d 601, 606 (2005) (quoting *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (internal quotation marks and citation omitted)). Thus, to determine whether or not Appellees were parties to the Purchase Agreement, the language of the contract must first be examined.

This court has determined that "[i]t is fundamental that terms of contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." *Brown*, 82 Hawai'i at 240, 921 P.2d at 160 (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992) (citation and internal quotation marks omitted)). Further, "[i]n construing a contract, a court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety. If there is any doubt, the interpretation which most reasonably reflects the intent of the parties must be chosen." *Id.* (quoting *Univ. of Hawaii Prof'l Assembly v. Univ. of Hawaii*, 66 Haw. 214, 219, 659 P.2d 720, 724 (1983) (citations and internal quotation marks omitted)).

### IX.

The plain language of the Agreement indicates that Appellees are not parties to the Agreement. The Agreement states, "This Agreement to [p]urchase [the] Hotel is made and entered into as of June 1, 2001, by and between K.S.K. (Oahu) Limited Partnership, a Hawai'i limited partnership, and Laeroc Waikiki Parkside, LLC, a Hawai'i limited liability company, or its permitted assignee." Appellees are designated only as "Seller's Representatives" and the Agreement thus identifies the only seller as KSK, and the only purchaser as Appellant.

Moreover, as Appellees point out, Appellant's complaint identifies Appellees as KSK's representatives in the sale and purchase of the Hotel. Paragraph 9 of the Complaint states that "[Appellant] purchased the [Hotel] from Defendant KSK pursuant to a June 1, 2001 [Agreement], by and between [Appellant,] as purchaser, and Defendant KSK, as seller[.]" Paragraph 11 of the Complaint states, "At all relevant times herein prior to the Sale/Purchase, and as set forth in Article 1 of the [Agreement], [*Appellees*] *were Defendant KSK's representatives in the Sale/Purchase,* and were at all such times and thereafter, managerial employees and/or officers of Defendants HAWAIIANA and/or KSK." (Emphasis added.)

Thus, based on the express language of the Agreement, Appellees appear to be agents and not parties to the Agreement. As noted above, the only way that an agent making a contract on behalf of a disclosed principle would become a party to the agreement would be if the agent manifests an intent to become a party as *"the inference is that the parties have agreed that the principal is, and the agent is not, a party."* *Pancakes*, 85 Hawai'i at 308–09, 944 P.2d at 105–06 (quoting Restatement (Second) of Agency § 320 cmt. a, at 67) (emphasis added).

Appellant cites *Cox v. McLaughlin*, 315 Ark. 338, 867 S.W.2d 460 (1993), as their sole authority on this issue. In that case, as Appellant notes, the Arkansas Supreme Court stated that, "the law is well established that an agent is not liable to a third party for a contractual obligation made by a disclosed principal unless the agent is specifically named in the contract and there is evidence of his intent to be bound." *Id.* at 463 (citation omitted). Appellant argues that because Appellees are expressly identified in the contract and agreed to perform the disclosure obligations under the Purchase Agreement, they intended to be bound by the agreement.

However, Appellees are explicitly identified as agents in the Purchase Agreement and the mere fact that they had obligations and duties in their role as agents does not transform Appellees from "Seller's Representatives" into parties. Appellant failed to provide any evidence as to how, then, Appellees manifested an intent to be bound by the contract, aside from the description of their roles within the Agreement. Thus, Appellees are not parties to the Agreement.

## X.

■ As to Appellant's issue (2)(a), Appellant argues that because Appellees took the position in their July 16, 2003 memorandum in support of Appellees' motion for summary judgment that they were not parties to the Agreement or third party beneficiaries, Appellees are judicially estopped from enforcing the Nonrecourse Provision. Appellant further declares that "because the [court] accepted Appellees' position in previously granting Appellees summary judgment upon Count I ..., the doctrine of judicial estoppel precludes Appellees from taking a contrary position in their subsequent motion for summary judgment."

Appellant relies on *Pancakes*. In *Pancakes*, Sofos Realty Corporation (Sofos) handled the managing and leasing duties of Lahaina Shopping Center in Lahaina, Maui, and Lee Carter (Carter) was a real estate agent who worked for Sofos. 85 Hawai'i at 303, 944 P.2d at 100. Sofos and Carter engaged in negotiations with Pancakes of Hawai'i, Inc. (Pancakes), resulting in Pancakes entering into a lease agreement with Pomare Properties Corporation (Pomare) to open a restaurant in the Lahaina Shopping Center. *Id.* The lease agreement contained an explicit waiver of trial by jury. *Id.* at 303–04, 944 P.2d at 100–01. Due to low foot traffic, Pancakes closed its restaurant and commenced suit against, *inter alia*, Sofos, Carter, and Pomare. *Id.* at 303, 944 P.2d at 100. Pursuant to the waiver of trial by jury, Pomare moved to strike Pancakes' demand for a jury trial. *Id.* at 303–04, 944 P.2d at 100–01. The trial court granted the motion. *Id.* at 304, 944 P.2d at 101. Pomare settled, and Pancakes proceeded with its claims against Sofos and Carter. *Id.*

On appeal, Pancakes contended that Sofos and Carter were not parties to the agreement, thus they could not use the agreement to shield themselves from a jury trial. *Id.* The ICA held that Pancakes was correct in its contention and that "there was clearly no unequivocal act indicating that a jury trial was waived for Sofos, Carter, or any other third party." *Id.* at 309, 944 P.2d 97 at 106.

With respect to third-party beneficiaries, the ICA stated that " '[a] third party beneficiary is one for whose benefit a promise is made in a contract but who is not a party to the contract.' " *Id.* (citations omitted). The ICA further stated that "a prime requisite to the status of 'third party beneficiary under a contract is that the parties to the contract must have intended to benefit the third party, who must be something more than a mere incidental beneficiary.' " *Id.* (citations omitted); *see also Blair v. Ing*, 95 Hawai'i 247, 255, 21 P.3d 452, 460 (2001) (explaining that

"[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain" and that "the third party beneficiary approach focuses the existence of a duty entirely on whether the plaintiff was the person intended to be benefitted by the legal services and does not extend to those incidentally deriving an indirect benefit" (internal quotation marks and citations omitted)).[15]

Appellant argues that, like Sofos' and Carter's inability to enforce a jury waiver provision in the lease agreement, Appellees are also precluded from enforcing the Nonrecourse Provision against Appellant since Appellees are not parties to or third-party beneficiaries of the Agreement. However, *Pancakes* is distinguishable from the case at hand.

As Appellees state, they "have never claimed that they were parties to the ... Agreement and have also affirmatively stated that they are not claiming to be third-party beneficiaries of the ... Agreement."[16] Instead, Appellees argue that "Appellant agreed that its sole recourse for any damages in connection with its purchase of the [H]otel would be against seller KSK" and that therefore Appellees are not liable by the express terms of the Agreement. (Some

capitalization omitted.) As Appellees indicate, "*Pancakes* is inapplicable ... because Paragraph 8.2 contains the express agreement of Appellant not to pursue claims against any affiliates or representatives of Seller KSK. Appellees are not attempting to enforce the Purchase Agreement against Appellant as the agents were attempting to do with regard to the waiver of jury clause in [sic] in *Pancakes.*"

Whereas Sofos and Carter attempted to enforce a provision of the lease agreement agreed to between Pancakes and Pomare, Appellees here seek to hold Appellant to Paragraph 8.2 which specifically applies to and protects them from liability to Appellant as agents of KSK. Article 1 of the Agreement defines Appellees as Seller's agents, see *supra*, and Paragraph 8.2, in turn, explicitly protects Seller's agents. Therefore, judicial estoppel as to Appellees' status as nonparties to the Agreement does not prevent them from raising the Nonrecourse Provision as a defense.

### XI.

 As to Appellant's issue (2)(b), Appellant claims that Appellees fraudulently induced Appellant to enter into the Agreement.[17] In support of its fraudulent induce-

---

15. As noted *supra*, Appellees never claimed to be third-party beneficiaries, and have, in fact, affirmatively stated that they are not claiming to be third-party beneficiaries. Furthermore, Appellees cannot be third-party beneficiaries since the Agreement does not indicate that Laeroc and KSK "agreed between themselves to bestow a benefit upon the [Appellees,]" as is required by *Blair*. The Agreement explicitly states in Article 18, ¶ 18.17, entitled "No Third Party Beneficiary," that

[t]his Agreement and each of the provisions hereof are solely for the benefit of Seller and Purchaser and their permitted successors and assigns. No provisions of this Agreement, or of any of the documents and instruments executed in connection herewith, shall be construed as creating in any person or entity other than Seller and Purchaser and their permitted successors and assigns any rights of any nature whatsoever.

16. Appellant argues that at a February 16, 2005 hearing, counsel for Appellees stated, "Your honor, I just want to say that if we're not parties, why are they suing us for claims arising out of

the purchase agreement? They are suing us, and they can't have it both ways." Based on this statement, Appellant maintains that "[a]ccordingly, Appellees took the position that they were parties to the Purchase Agreement by using a negative rather than a positive statement" and question "[w]hy did Appellees need a non-recourse provision .... [b]ecause they were parties to the Purchase Agreement." Inasmuch as the factual basis of Appellant's "alleged point of error is not part of the record on appeal, this court has no basis upon which to rule on the merits of his claim." *State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (citation omitted). As such, we do not address it.

17. It does not appear that Appellant directly raised the issue of fraudulent inducement below inasmuch as, as noted above, the Complaint alleged breach of contract, breach of fiduciary duties, misrepresentation, nondisclosure, indemnification, punitive damages and declaratory and injunctive relief. However, "Hawaii's rules of notice pleading require [only] that a complaint set forth a short and plain statement of the claim

**216**

ment argument Appellant cites *Fujimoto*, which concluded that there was "a genuine issue of material fact as to whether the plaintiffs' subscription agreements were fraudulently induced." 95 Hawai'i at 157–158, 19 P.3d at 740–741.

■ In *Fujimoto*, this court stated the relevant test to determine what constitutes fraudulent inducement sufficient to invalidate the terms of a contract. To demonstrate fraudulent inducement there must be "(1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage." *Id.* at 157, 19 P.3d at 740 (brackets and citations omitted).

However, aside from correctly explaining that where a contract is fraudulently induced, the exculpatory clause will not limit liability, Appellant fails to make any arguments in its brief regarding any fraudulent inducement except to argue that "[g]iven that [the] factual record raises genuine issues of material fact whether Appellees, on . . . behalf of KSK, fraudulently induced Appellant into the Agreement by their misrepresentations and

that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests[,]" *In re Genesys Data Technologies, Inc.*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) (citing Hawaii Rules of Civil Procedure Rule 8(a) (1999); *Au v. Au*, 63 Haw. 210, 220, 626 P.2d 173, 181 (1981)), and that "[p]leadings . . . be construed liberally[,]" *id.* (citation omitted). A liberal reading of Appellant's misrepresentation and nondisclosure claims shows that Appellees should have been on notice of Appellant's fraudulent inducement claims and "the grounds upon which the claim rests." *Id.* (citation omitted). The test for fraudulent inducement requires: "(1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage." *Fujimoto v. Au*, 95 Hawai'i 116, 157, 19 P.3d 699, 740 (2001) (brackets and citations omitted). In Count III, "Misrepresentation," Paragraph 28 of the Complaint, Appellant states that,

Defendant Izutsu and Defendant Nakamura represented to Plaintiff [L]aeroc, among other things, that: (a) [the Hotel's] roof never leaked and had years of life remaining; (b) [the Hotel] never had a termite infestation; [and] (c) [t]he

non-disclosures after the execution of the Agreement, the [court] should have denied Appellees summary judgment on Counts I through VI." Appellant does not specify what facts demonstrate fraudulent inducement; rather, Appellant appears to point to the facts, or the "factual record," in general.

**A.**

The "statement of the case" section of Appellant's brief contains a subsection entitled "Appellees' Misrepresentations and Non–Disclosures[.]" [18] In that section Appellant identifies four "[m]isrepresentations" or "[n]on-disclosures." First, Appellant argues that in a recorded conversation between Morgan and Izutsu, (a) "Izutsu admitted he told Morgan the 'air conditioning system was working fine,'" (b) Izutsu admitted "there were leaks into the rooms before [A]ppellant purchased the Hotel" and (c) Izutsu "did not deny that he and Nakamura never told Morgan about the leaks in the rooms." Appellant points to a portion of the recorded conversation previously mentioned, which states as follows:

P [MORGAN]: Were there any leaks before we bought it?

mechanical systems of [the Hotel], including the HVAC and plumbing systems, were operating satisfactorily and in good working order and did not need any repairs.

Appellant further contends in Paragraph 30 of the Complaint that "[s]uch representations were made to induce and did induce [Appellant] to purchase the [Hotel] for an excessive price because [Appellant] did not know the true condition of the [Hotel] and [Appellant] reasonably relied upon such representations."

In Count IV, "Nondisclosure," Paragraph 34 of the Complaint, Appellant further alleges that "the material facts within or which should have been within Defendants [KSK], Hawaiiana, [and Appellees'] knowledge as set forth above were not known by [Appellant] and as a result, Defendants [KSK], Hawaiiana, [and Appellees] each had a duty to inform [Appellant] of such material facts." As such, Appellant fulfilled the "notice pleading" requirement and the fraudulent inducement claim was preserved on appeal.

**18.** Although Appellant presents no evidence in the argument portion of its opening brief to support the fraudulent inducement claim, the title found in the facts section indicates that Appellant intended this section to refer to evidence demonstrating fraudulent inducement.

F [IZUTSU]: Ahh, yes there were[.]

P: You and [Nakamura] never told me anything about that[?]

F: (silence—2 seconds)

. . . .

Appellees respond that this conversation occurred over a year after the sale of the Hotel when "Morgan called Izutsu out of the blue, and without telling Izutsu, taped the conversation." Appellees assert that "Appellant selectively quotes from the transcript of its secretly[-]recorded conversation . . . misstat[ing] the substance of the conversation" and maintain, instead, that "Izutsu's silence was due to the fact that he had already forthrightly answered this question at the outset of the conversation." The conversation, as related before, stated:

P [MORGAN]: [D]o you have a quick second for me?

F [IZUTSU]: Sure[.]

P: Thank you. You know we are working with Aston on a couple of things here, umm, one has to do with the roof, umm, before we bought the hotel you told me that the roof did not leak. Do you remember that[?]

F: Umm, no[.]

P: Did the roof ever leak?

F: Yes, it was because, remember the 11th floor umm, had umm, water coming through.

P: No I don't remember you ever telling me, or showing me the roof on the 11th floor.

F: (2 SECOND SILENCE) Umm, (pause) . . . .

P: Where else did it leak?

F: It, umm, umm, in the umm, meeting room[.]

P: You never told me about that.

F: Umm, I thought I told you. I thought I mentioned all those things to you.

Thus, Appellees further maintain that "Izutsu accurately stated that the 'air conditioning system was working fine' because the air conditioning system was working fine and never interfered with the operation of the Hotel during the time that Izutsu managed the Hotel except during a renovation project in 1992." They argue "[t]his is consistent with the fact that Appellant operated the Hotel for eighteen (18) months after the [c]losing date."

Appellant does not attempt to show how any of the above allegations satisfy the elements required for fraudulent inducement. Taken in the light most favorable to Appellant, as is required in summary judgment proceedings, this conversation still does not demonstrate that Izutsu fraudulently induced Appellant to act, as set out in the *Fujimoto* test. It appears, based on this conversation, that Appellant was unaware that the "leaks . . . happen[ed] from room to room" but Appellant fails to state what material fact was represented. Further, the conversation between Izutsu and Morgan does not demonstrate that Izutsu misrepresented a material fact as Izutsu neither confirmed nor denied that he did not tell Morgan that the roof leaked, nor does Appellant indicate why this information was a material fact.

■ Second, Appellant does not explain how this statement was "made for the purpose of inducing the other party to act," as is required under the *Fujimoto* test.[19] Third,

---

**19.** Although Appellant makes no attempts to "tie up" its arguments with the facts, it does, also in the facts section include another separate section entitled "Appellant's Reliance Upon KSK's Representations, Warranties and Non-disclosures" and states in full as follows:

As set forth in Morgan's February 6, 2004 Declaration, Morgan stated that had Izutsu and Nakamura ·given him the Minutes, the Ferris Report and disclosed the condition of the Hotel, Morgan would have retained consultants to examine the Hotel's latent defects and upon knowing the extent of such latent defects, Morgan would have recommended that the Hotel not be purchased by Appellant[.] However, given Appellees' misrepresentations, concealment and non-disclosures, Appellant closed the purchase of the Hotel on August 24, 2001.

The appellate courts are not obliged to search the record to crystallize the parties' arguments. *See Lanai Co., Inc. v. Land Use Comm'n,* 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." (Citations omitted.)).

because it is unclear what material fact Appellant claims was misrepresented, it cannot be said that this conversation demonstrates that this statement was "known to be false but reasonably believed true by the other party." Because none of the other prongs of the test are met, it is immaterial whether Appellant "relie[d] and act[ed] to his or her damage," as is required by the fourth prong of the *Fujimoto* test.

## B.

Second, Appellant argues that "Izutsu did not give Morgan [the] Minutes or [the] Ferris Report." (Some capitalization omitted.) Appellant states that "Bloom admitted he received Aston and Appellant's due diligence checklists by way of a May 14, 2001 fa[x] from [KSK's broker]" and that the "[Morgan] Minutes 'would have been addressed under a category such as [the] overall condition report.'" In this fax, KSK's broker allegedly stated that "[a]ttached are lists of items that LaeRoc ... will be requesting while conducting their due diligence at the [Hotel]." However, despite this request, Appellant maintains that "Izutsu did not copy the Minutes for Morgan, did not show Morgan the Minutes located by Cheryl Yoshioka[,] did not show Morgan the Minutes in the Storage room," and "Morgan was never given or shown the Ferris Report."

Appellees answer that "pursuant to the express language of the [Agreement,] Bloom advised Appellant that Defendants would not be 'collecting' information that may or may not fit within the description of the documents requested, but as stated in the [Agreement], all documents would be made available at the Hotel for Appellant's review." Further, Appellees maintain that "[f]rom 1996 to July 2001 when the Hotel was sold to Appellant, there were approximately 286 different reports of the weekly manager's meetings" and "[o]ut of 286 weekly meeting minutes ... Appellant was able to find ten instances where references were made to mold or mildew" which "concerned using a mildew retardant cleaner to clean mildew or mold off of the air-conditioning grills, a single report of an isolated moldy

smell, and one entry of mildew being found in one room of the 255[-]room Hotel[.]"

As to the "Ferris Report[,]" Appellees maintain that "no such document exists" and that what Appellant purports is a Report is "nothing more than an incomplete, one page letter dated April 11, 1997. The existing portion of the letter purports to make a proposal for chiller replacement at the Hotel." Thus, Appellees argue that the letter itself was inadmissible and properly objected to because "we don't know what the entire document concludes," but even if it is considered, "there is no evidence that any of the Appellees received this document prior to the sale of the Hotel" and "other documents in Appellant's possession clearly establish that major work, including the replacement of the air cooled condenser on the roof at the Hotel was done to the HVAC system after 1997." (Citing the CEI Report indicates that approximately $158,090.00 was done by KSK to the HVAC system from 1997 through 2001.)

Again, although it appears that Appellant cites to the above matters as evidence of fraudulent inducement, it fails to demonstrate how the elements of fraudulent inducement are met. These allegations do not indicate how the failure to provide these documents was a representation of material fact. It appears that these documents may have given some insight into whether there was mold in, or problems with, the air conditioning. However, Appellant fails to demonstrate that Appellees had any duty to provide such documents or even allege that the failure to provide them was "for the purpose of inducing the other party to act" based upon facts "known to be false but reasonably believed true by the other party[,]" as is required by *Fujimoto*. Thus, it does not appear, even construed in a light most favorable to Appellant, that there was evidence adduced of fraudulent inducement based on the Minutes or the "Ferris Report."

## C.

Third, Appellant maintains that KSK failed to disclose information related to the CEI Report. It states that "City Bank contracted with [CEI] for a property condition report[.]" Apparently based on knowledge of this re-

port, Appellant asserts that, "[o]n July 6, 2001, Morgan sent a copy of the CEI Report to Bloom and asked [to] 'Please check with Fred to see if he has any reports that may clarify some of the issues referenced[.]'" Appellant further states that "[o]n July 12, 2001, ... [KSK's Attorney] responded that[,] '[a]s regards other reports, Seller does not have the technical expertise to review the Assessment and decide which, if any [Hotel] materials are applicable.'"

However, Appellant argues that "[c]ontrary to [KSK's Attorney's] statement to Appellant, Nakamura was a member of the Hotel Association Advisory Council ... and had in his office: (1) Minutes of a February 9, 2000 meeting of the Council" where there was "a presentation concerning 'Moisture and Mildew Problems in the Hospitality Industry Buildings[,]' ... (2) a copy of a [Meeting hand-out] noting the '$6.5M Moisture & Mildew Problem'" at a number of hotels, and "(3) an April 26, letter from Civil Mechanical to Nakamura regarding remote television inspection of waste lines allowing 'full disclosure of the condition' of 'drain lines' to a buyer."

Appellees contend that because Nakamura was "a member of the Hawai'i Hotel Association Advisory Council and had materials from meetings or seminars in his office[, he was] an expert in mold and mildew problems ... [,] is like stating that a lawyer who is a member of the Hawai'i State Bar Association and has copies of materials from a securities litigation seminar in his office is actually qualified to handle a securities matter" and "[i]t is rank speculation to make the leap from one to the other." As inferred by Appellee, Appellant presents no discernible arguments regarding how the fact that Nakamura was a member of the Hotel Association Advisory Council and had documents generally discussing mold problems in the hotel industry (assuming that to be the case) either made him an expert in mold or mildew problems or explained how withholding any of these general documents fraudulently induced Appellant into buying the Hotel. Thus, we need not address the issue further. *See Bui*, 104 Hawai'i at 464, 92 P.3d at 473.

**D.**

Finally, Appellant argues with respect to the Nakamura photographs, that "Nakamura knew that the CWP insulation in the Hotel had failed." In support of this assertion, Appellant declares that Aston "put together a report upon the Hotel which contained 18 Polaroid photographs Nakamura voluntarily gave to [Aston] on December 12, 2001, containing titles written by Nakamura" and that "[p]oloroid photograph No. 13 is of the wall and floor of a guest room with a dark water stain with the [phrase] 'RISERS NEED RELAGGING,'" meaning that the CWP risers need re-insulation. (Some capitalization omitted.) Appellees answer that Nakamura "voluntarily provided these photos" and "[t]his is not the act of someone hiding a 'smoking gun.'" Further, Appellees assert that "at most, the only fact that these photographs establish is that on December 12, 2001, Nakamura was aware that the risers behind the wall may be something that Aston maintenance might want to be aware of" and "[t]his does not establish any knowledge on the part of Nakamura or the Appellees of any problems with the risers prior to December 12, 2001."

Appellant does not disclose or explain how these photographs establish that Nakamura knew the CWP insulation had "failed." Further, Appellant again fails to relate how any of these allegations meet any prong of the *Fujimoto* test. In fact, according to Appellant, Nakamura "voluntarily" made these photographs available. Thus, it is difficult to see how Nakamura could be "represent[ing] ... a material fact ... known to be false" as *Fujimoto* requires in making a fraudulent inducement claim.

 Thus, even if all of the above alleged facts are taken to be true, Appellant fails to establish that Appellees fraudulently induced Appellant to buy the hotel. As this court has repeatedly held, where a party fails to present evidence on the claim upon which they seek relief, a grant of summary judgment is appropriate. *See French*, 105 Hawai'i at 465, 99 P.3d at 1049 (holding that summary judgment was appropriate where the appellant "failed to make a *prima facie* showing of age discrimination"). Appellant maintains that

the court granted summary judgment based solely on the Nonrecourse Provision. However, as noted above, the court did not provide an explanation for its grant of summary judgment. Because Appellant has failed to make initial allegations that satisfy the fraudulent inducement test, we cannot say that ultimately the court was incorrect in granting summary judgment even assuming summary judgment was granted based on the Nonrecourse Provision. *See Kahaikupuna v. State,* 109 Hawai'i 230, 233–34, 124 P.3d 975, 978–79 (2005) (affirming summary judgment on different grounds than the trial court and explaining that "an appellate court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it" (citing *McCarthy v. Yempuku,* 5 Haw.App. 45, 52, 678 P.2d 11, 16 (1984) (other citation omitted))).

## XII.

### A.

As to Appellees' issue (2)(d),[20] the Nonrecourse Provision states as follows:

> *Purchaser further acknowledges that Purchaser shall not have recourse against any agent or partner of Seller,* or the officers or directors of the partners of Seller, or the personal assets of any partner of Seller with respect to any default under this Agreement or any document executed in connection therewith, *or Seller's agents or attorneys, except where such claim, demand or cause of action results from any fraud, willful misconduct, or criminal acts of Seller,* or such officers directors, partners, attorneys or agents, *and that Purchaser's sole recourse shall be against Seller and shall be limited to the sale proceeds paid to Seller as specified in this Agreement.*

(Emphases added.) Interpreting the above provision, Appellant alleges that (1) "the [court] misconstrued the 'except where' phrase of the Nonrecourse Provision" because "[t]he 'except where' phrase excludes

'fraud, willful misconduct and criminal acts' from the immunizing effect of the *entire* Nonrecourse Provision rather than just the 'sale proceeds' limitation in the last phrase of the Nonrecourse Provision"; and (2) "[b]y using the word 'recourse' and the phrase 'with respect to any default under this [Purchase] Agreement or any document executed in connection therewith,' the Nonrecourse Provision attempts to limit Appellees' personal liability … [but] cannot be read to release or waive Appellees' non-contractual liability[.]" As such, Appellant maintains, the Nonrecourse Provision is "narrowly drafted" and thus cannot "broadly immunize" Appellees.

On the other hand, Appellees maintain the above provision expressly limits Appellant's "sole recourse for any damages in connection with [the] purchase of the Hotel … [to the] seller KSK" and "[t]he language of Section 8.2 of the Purchase Agreement is clear and unambiguous … [,] express[ing] the intent of Appellant and Seller KSK to limit any claims that Appellant has under the [Agreement] to claims for alleged fraud against the seller only." Thus, Appellees contend that "Appellant … agreed that its sole recourse would be against the Seller KSK even if its claims arose 'from any fraud, willful misconduct or criminal acts' of Seller's agent."

As to Appellant's first assertion, as noted above, the Nonrecourse Provision prohibits "recourse against any agent … with respect to any default under this Agreement or any document executed in connection therewith … *except where such claim, demand or cause of action results from any fraud, willful misconduct, or criminal acts of Seller, or such officers directors, partners, attorneys or agents* [.]" (Emphasis added.) The words "except where" " 'should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning.' " *Brown,* 82 Hawai'i at 240, 921 P.2d at 160 (quoting *Amfac,* 74 Haw. at 108, 839 P.2d at 24). There is no alternate definition of "except where" in the contract so we construe the

---

**20.** Issues (2)(c) and (2)(d) are discussed out of chronological order here in order to logically

address Appellant's claims.

phrase "except where" according to its "'plain, ordinary and accepted use in common speech[.]'" *Id.* (quoting *Amfac*, 74 Haw. at 108, 839 P.2d at 24). The word "except" can be defined as "with the exclusion or exception of." *Webster's Third New Int'l Dictionary* at 791. The word "where" is defined as "in what situation, position, or circumstance." *Id.* at 2602. Applying these definitions, the phrase "except where" may be read as "with the exclusion or exception of," *id.* at 791, enumerated "situation[s], position[s], or circumstance[s,]" *id.* at 2602.

Consequently, here, the enumerated circumstances excluded from the Nonrecourse Provision are "claim[s], demand[s] or cause[s] of action result[ing] from any fraud, willful misconduct, or criminal acts of . . . [the] agent[.]" Appellant's interpretation of the "except where" phrase comports with a plain language analysis. The "except for" language, then, entirely removes certain conduct from the scope of the Nonrecourse Provision. Accordingly, notwithstanding the general prohibition of recourse against Seller's agents, the "except where" provision permits recourse against the agents for claims of "fraud, willful misconduct, or criminal acts[.]"

■■■ Assuming, *arguendo*, that the Nonrecourse Provision could be interpreted as Appellees contend, "[w]hen a contract term can be interpreted in at least two ways, and when one of those interpretations would result in a valid contract and the other would cause the agreement to be void or illegal, the former interpretation is preferred." Margaret N. Kniffin, Corbin on Contracts § 24.22 at 232 (rev. ed.1998). As Appellees' interpretation would render the agreement void as against public policy, *see infra*, Appellant's reading is preferred.

## B.

### 1.

■■■ As to Appellant's second assertion that the Nonrecourse Provision "cannot be read to release or waive Appellees' noncontractual liability," because the Nonrecourse Provision does not explicitly contain the words "release" or "waive," it cites *Fujimoto*, 95 Hawai'i at 156, 19 P.3d at 739, and *Krohnert v. Yacht Sys. Hawaii, Inc.*, 4 Haw. App. 190, 198, 664 P.2d 738, 744 (1983). Exculpatory clauses are generally valid unless the bargaining power of the promisee is superior to that of the promisor.[21] *Fujimoto*, 95 Hawai'i at 155, 19 P.3d at 738. In *Fujimoto*, this court stated that "[i]t is true that a party can contract to exempt himself from liability for harm caused by his negligence." *Id.* (citing Restatement (Second) of Contracts, § 195 cmt. a (2001); 15 *Williston on Contracts*, § 1750A at 144 (3d ed.1972)). However, exculpatory clauses "are strictly construed against the promisee and will not be enforced if the promisee enjoys a bargaining power superior to the promisor, as where the promisor is required to deal with the promisee on his own terms." *Id.* (citations omitted). Therefore, as a general rule, "'[e]xculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power.'" *Id.* at 156, 19 P.3d at 739 (quoting *Andrews v. Fitzgerald*, 823 F.Supp. 356, 378 (M.D.N.C.1993) (other citation omitted)).

■■■ In *Fujimoto*, this court further quoted *Yauger v. Skiing Enters., Inc.*, 206 Wis.2d 76, 557 N.W.2d 60 (1996), to the effect that "[e]xculpatory contracts are not favored by the law because they tend to allow conduct below the acceptable standard of care. . . . [A] court closely examines whether such agreements violate public policy and *construes them strictly against the party seeking to rely on them.*" *Fujimoto*, 95 Hawai'i at 155–56, 19 P.3d at 738–39 (quoting *Yauger*, 557 N.W.2d at 62) (emphasis added). Similarly, in *Krohnert*, the ICA invalidated an exculpatory clause that shielded a profes-

---

21. A nonrecourse provision is similar to a exculpatory provision or, perhaps more aptly, a nonrecourse provision is specific type of exculpatory clause. *Cf. Sylvia v. Johnson*, 44 Mass.App.Ct. 483, 691 N.E.2d 608, 609 (1998) ("Ordinarily, an exculpatory clause releases a party from his wrongful acts" whereas "[a] nonrecourse clause, on the other hand, ordinarily creates a limitation on personal liability.") (Citing Black's Law Dictionary 566, 1057 (6th ed.1990)). Thus, the case law analyzing exculpatory provisions is applicable here.

sional marine surveyor from liability for his own negligence arising from his assessment of a wooden ketch. 4 Haw.App. at 198–200, 664 P.2d at 743–45. Although the ICA found that the exculpatory clause in question was permissive since there was no superior bargaining power, the ICA nevertheless held that the parties had not "clearly and unequivocally" agreed to the clause. *Id.* at 200, 664 P.2d at 745.

Appellees contend that *Fujimoto* and *Krohnert* are distinguishable from the case at hand because those cases involved unsophisticated parties. They argue that in the instant case, Paragraph 8.2, the Nonrecourse Provision, was agreed to by Appellant and Appellant's attorneys, so there was no unequal bargaining power between Appellant and KSK. Appellees are correct to the extent that the facts do not indicate this is a case of unequal bargaining power; however, *Fujimoto* and *Krohnert* do not limit the rule of strict construction to agreements involving only unsophisticated parties. Therefore, the rule of strict construction is applicable in this case.

### 2.

In pertinent part the Nonrecourse Provision states that the purchaser shall not have recourse "*with respect to any default under this Agreement or any document executed in connection therewith.*" (Emphasis added). Appellees cite *Hoosier Energy Rural Elec. Coop. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310 (7th Cir.1994), to support their argument that "[n]on-recourse provisions are enforceable to bar claims that go beyond what was agreed upon in contract."

In *Hoosier*, Hoosier Energy and Amoco Tax entered into a sale-leaseback agreement which contained a nonrecourse provision.[22] *Id.* at 1315. Following a disagreement about payments, Hoosier Energy brought breach of

contract and unjust enrichment claims against Amoco Tax. *Id.* at 1314. Amoco Tax claimed that the nonrecourse provision shielded it from all liability. *Id.* Hoosier Energy responded by contending that "the non-recourse provision merely prevents it from suing Amoco Corporation for breach of contract but does not preclude it from suing Amoco Corporation on a non-contract theory such as unjust enrichment." *Id.* at 1316.

In finding that the nonrecourse provision did protect Amoco Tax from all liability, the Seventh circuit stated,

> there is no ambiguity as to whether this provision bars "non-contract" claims-it clearly does. Section 17(e) of the agreement states that Hoosier Energy has no recourse against Amoco Corporation for any amount payable under the agreement or for any claim "based on" the agreement or otherwise "in respect to" the agreement. This language broadly applies to any claim that is in any way "based on" the sale-leaseback agreement or otherwise "in respect to" the agreement.

*Id.* Thus, the court interpreted the "based on" and "in respect to" language broadly to protect Amoco Tax from liability beyond claims based in contract. *Id.*

■ However, *Hoosier* is inapplicable here in light of the strict construction rule adopted in *Fujimoto* and *Krohnert*. First, the "based on" and "in respect to" language in *Hoosier* is broader than the "any default under" language in the Nonrecourse Provision at hand. Second, in light of our determination regarding the "except where" clause of the recourse provision, it would be inconsistent to "except" "fraud, willful misconduct, or criminal acts[,]" of agents but then to limit any recovery of damages on such claims to those established as available only against the seller. Third, based on the narrow construction required, the provision

22. The nonrecourse provision stated, in relevant part:

> *No recourse shall be had* for the payment of the Section 168 Loans, or for any other amount payable hereunder or *for any claim based thereon or otherwise in respect thereof or based on or in respect to this Agreement*, against, Amoco Leasing Corporation (Amoco's sole stockholder) . . . or of any Affiliate of Amoco

> . . . it being expressly understood that all obligations of Amoco under this Agreement are solely corporate obligations and that all such liability of Amoco Leasing Corporation and any other Affiliate of Amoco . . . is and is hereby agreed to be expressly waived and released as a condition of, and as consideration for, the execution of this Agreement. . . .

Hoosier, 34 F.3d at 1315 (emphases added).

limiting Purchaser's "sole recourse" to the Seller for "the sale proceeds" cannot be read as limiting claims for fraud and willful misconduct (as well as criminal conduct). Finally, where it is against public policy to allow a party to contract out of fraud or willful misconduct, as noted *infra*, it would be against such policy to cap damages for intentional conduct to that recoverable under the Nonrecourse Provision from another party.

In sum, under the Agreement or any document executed in connection therewith, the Nonrecourse Provision pertains to default on the contract, and recourse thereon is limited to sale proceeds. However, the "except where" clause allows claims to be brought for "fraud, willful misconduct, or criminal acts" against "Seller, or ... officers directors, partners, attorneys or agents[.]" Under the Nonrecourse Provision, then, recovery in damages for fraud, willful misconduct, and criminal acts is not limited to the seller's proceeds.

## XIII.

Assuming *arguendo* that the Nonrecourse Provision did not expressly exclude fraud, willful misconduct, and criminal acts, as Appellant asserts in issue (2)(c), "public policy forbids the inclusion of fraud and other willful misconduct in exculpatory/limitation of damages provisions[.]" According to Appellant "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 195(1). *See Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 109 Ill.Dec. 541, 510 N.E.2d 409, 415 (1986) ("An exculpatory clause cannot protect persons from the results of their wilful and wanton misconduct. Such a contractual shield is illegal." (Citations omitted.)).

Hawai'i courts have not stated that public policy forbids exempting tort liability in cases of intentional or reckless tortious conduct. However, as this court said in *Fujimoto*, under some circumstances, the public interest will not countenance an exculpatory clause. "The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Fujimoto*, 95 Hawai'i at 155, 19 P.3d at 738 (internal quotation marks and citations omitted).

This court further instructed that "[p]arties are permitted to make exculpatory contracts so long as they are knowingly and willingly made and *free from fraud*. No public policy exists to prevent such contracts." *Id.* at 156, 19 P.3d at 739 (citations and brackets omitted) (emphasis added). While "[i]t is true that a party can contract to exempt himself from liability for harm caused by his negligence[,]" *id.* at 155, 19 P.3d at 738 (citations omitted); *see also Wheelock v. Sport Kites, Inc.*, 839 F.Supp. 730, 736 (D.Haw.1993) (explaining that "Hawaii courts permit a waiver of negligence claims"); most jurisdictions deciding this issue have held that an exemption for intentional torts and reckless conduct is void as against public policy. *See Alack v. Vic Tanny Int'l of Missouri, Inc.*, 923 S.W.2d 330, 337 (Mo.1996) (explaining that "there is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest" (citations omitted)); *Kellums v. Freight Sales Ctrs., Inc.*, 467 So.2d 816, 817 (Fla.Dist.Ct.App.1985) ("A party may by an exculpatory clause, absolve itself of liability for negligence, but an attempt to absolve itself from liability for an intentional tort is against public policy." (Citations omitted.)); *see also* 8 S. Williston, *Williston on Contracts* § 19:23, at 291–97 (4th ed. 1998) ("An attempted exemption from liability for a future intentional tort or crime or for a future willful or grossly negligent act is generally held void, although a release exculpating a party from liability for negligence may also cover gross negligence where the jurisdiction has abolished the distinction between degrees of negligence and treats all negligence alike.").

Courts have reasoned that a public policy exception is widely accepted because it is based on a recognition that sound public policy requires greater deterrents to gross negligence or intentional misconduct than to ordinary negligence. Moreover, enforcing an exculpatory clause as applied to a

party's gross misconduct does little to aid the freedom of contract, because while businesspersons may reasonably anticipate accidents or ordinary negligence and account for who bears the risk of damage in setting the price of a contract, contracting parties rely on the other's good faith and fair dealing.

*Dominici v. Between the Bridges Marina,* 375 F.Supp.2d 62, 68 (D.Conn.2005). Finally, as the Restatement comments, "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy" because "[t]he law of torts imposes standards of conduct for the protection of others against unreasonable risk of harm" and "[o]ne cannot exempt himself from such liability for harm that is caused either intentionally or recklessly." Restatement (Second) of Contracts § 195(1) & cmt. a (1979) (citations omitted).

■ Expanding on the rationale and analysis in *Fujimoto* and *Krohnert,* we hold that a nonrecourse provision that explicitly protects a party from tort liability would be permissible as long as the agreement was not unconscionable and it was knowingly and willingly made, and, adopting the majority view of the states, such a provision is valid to the extent it does not waive liability in situations of intentional or reckless conduct. Thus, even if the agreement did not expressly exclude claims of criminal misconduct, fraud, or willful misconduct, public policy would forbid the making of contracts excluding intentional torts.

## XIV.

As to Appellant's issue (2)(e), Appellant claims that following the Hawaiiana Agreement, Appellees became sub-agents of Appellant from August 24, 2001 until December 17, 2001, when Appellees managed the Hotel for Appellant. Based on this apparent agency relationship, Appellant "is seeking breach of fiduciary duty (duties of loyalty, due care, utmost good faith and full disclosure) damages (Count II) and indemnity (Count V) for all amounts paid to Aston" as a result of Appellant's settlement agreement with Aston.[23] Appellant elaborates that Appellees are liable for injury arising out of "their acts of disloyalty, lack of due care, bad faith and non-disclosure."

## XV.

The first issue is whether the Nonrecourse Provision may be applied to claims for breach of fiduciary duty arising out of the Hawaiiana Agreement. Appellees maintain that Appellant "released Appellees from all liability from all documents in connection with the [Agreement]" and because "the Hawaiiana Agreement was executed in connection with the [Agreement] and expressly provides that it is entered into 'to facilitate completion of the Hotel sale[,]' " the [court] "correctly ruled that the [Nonrecourse Provision] of the [Agreement]" precluded Appellant's fiduciary duty claims.

Appellant responds that (1) the Nonrecourse Provision "does not refer to the Hawaiiana Agreement since the Hawaiiana Agreement has its own exculpatory and limitation of damages provision";[24] (2) "such

**23.** As noted, Aston was a party to this consolidated lawsuit but has since settled with Appellant. Appellant seeks indemnification for this settlement from Appellees.

**24.** The exculpatory provision in the Hawaiiana Agreement reads as follows:

To the fullest extent permitted by law, notwithstanding any other provision of this Agreement and *as a material part of the consideration to [Hawaiiana] for the Agreement, [Appellant] hereby waives and releases [Hawaiiana] from any and all claims, demands, losses, damages and expenses (including attorneys fees and costs of litigation) of [Appellant] and liabilities to [Appellant] of any nature whatsoever arising out of, resulting from or in any way connected with*

*this Agreement or [Hawaiiana's] performance or nonperformance of its obligations and responsibilities under this Agreement, except as shall arise directly from [Hawaiiana's] gross negligence or willful misconduct.* [Appellant] and [Hawaiiana] agree that in the event of [Hawaiiana's] gross negligence or willful misconduct, any claim of or liability of [Hawaiiana] to [Appellant] would be difficult to determine and that a reasonable estimate of the maximum amount for each event thereof would be equal to the amount of Base Management Fees and Incentive Management Fees paid by [Appellant] to Hawaiiana throughout the Term ..., therefore, Owner Agrees that the maximum amount of [Hawaiiana's] liability to [Appellant] for each event of such gross negligence and

inclusion would mean Hawaiiana (agent) would not be liable under the Hawaiiana Agreement to Laeroc (principal)"; and (3) "Appellees should have fiduciary duties to their principal (Laeroc) and, to argue otherwise, is illogical and against public policy" and that "[a]ccordingly, the Non–Recourse Provision is inapplicable to Laeroc's tort claims."

As to its contention (1), Appellant cites to no authority for its assertion that another exculpatory provision which also purports to limit Appellant's recourse except in the case of "gross negligence [and] willful misconduct" would render the Nonrecourse Provision inapplicable. Inasmuch as Appellant "presents no discernible argument in support of this contention[,] it is our prerogative to disregard this claim[,]" *Bui*, 104 Hawai'i at 464, 92 P.3d at 473 (internal quotation marks, ellipses, and citation omitted), and we do so here. Appellant's contention (2) need not be addressed because the only issue before us is whether *Appellees* breached their purported fiduciary duties to Appellant. Thus, we need not decide whether Hawaiiana, as agent and party to the Hawaiiana Agreement, would be liable to Appellant.

■ As to Appellant's contention (3), we need not construe the Hawaiiana provision because Appellees base their defense on the Nonrecourse Provision. The Nonrecourse Provision states that it will apply "with respect to any default under this Agreement or any document executed *in connection therewith.*"[25] (Emphasis added.) The phrase "in connection with" is generally interpreted broadly and defined as "related to[,]" "linked to[,]" or "associated with[.]" *See Metro. Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.*, 58 Mass.App.Ct. 818, 793 N.E.2d 1252, 1255 (2003) (stating that " '[i]n connection with' is ordinarily held to have even a broader meaning than 'arising out of' and is defined as related to, linked to, or associated with" (citations omitted)).

As argued by Appellees, the Hawaiiana Agreement was entered into in order to facilitate the purchase of the Hotel. The Hawaiiana Agreement expressly states that "[Appellant] intends to purchase [the Hotel]" and "intends to complete purchase of the Hotel ... on or about August 21, 2001." It further states that "Manager [ (Hawaiiana) ] is currently managing the Hotel for the present Owner [ (KSK) ] thereof (which is an Affiliate of [Hawaiiana] ), and was to terminate such management upon completion of the sale of the Hotel to [Appellant] as required by the purchase agreement."

However, according to the Hawaiiana Agreement, because "[Appellant] has yet to secure the services of an experienced hotel manager to operate the Hotel after the closing and desires to secure Manager's services on an interim basis for the management and operation of the Hotel thereafter[,] ... *[Hawaiiana] in order to facilitate completion of the Hotel sale and as a material accommodation to [Appellant]*, is willing to provide [Appellant] with Hotel management services for a brief temporary period after the Closing pursuant to the terms and conditions hereinafter set forth[.]" (Emphasis added.) Further, in the Term of Agreement section, Appellant and Hawaiiana agreed that "[t]he term of this Agreement shall commence upon the Closing and the commencement of [Appellant's] ownership of the Hotel[.]"

The Hawaiiana Agreement was entered into as a means of "facilitat[ing] completion of the Hotel sale" and as a "material accommodation" to Appellant. The terms relate to Appellant's purchase and subsequent ownership of the Hotel. Hawaiiana, the prior manager of the Hotel, agreed to stay on as manager because Appellant had yet to "secure the services of an experienced hotel manager." On the face of the Hawaiiana Agreement, it was plainly "related to" or "associated with" the Agreement and, thus, is a "document executed in connection therewith[.]" As such, the Nonrecourse Provision

willful misconduct will not exceed the amount of such Fees.
(Emphasis added.)

**25.** The word "therewith" is defined as "with that." *Webster's Third New Int'l Dictionary* at

2372. Thus, the issue is whether the Hawaiiana Agreement was "executed in connection" "with that" Agreement. Because the phrase "in connection with" is synonymous, we rely on cases interpreting that phrase.

is applicable unless there is some other reason not to enforce the provision.

## XVI.

### A.

Appellant argues that even if the Nonrecourse Provision would otherwise apply, because "the Nonrecourse provision fails to identify ... breach of fiduciary duty" for exclusion, such a claim is not barred by the provision. (Emphasis omitted.) Appellant relies on the "strict construction" rule from *Fujimoto* and an Illinois U.S. district court case which states that " 'Illinois law does not enforce such [exculpatory] clauses to exclude claims that are not 'explicitly covered' by the terms of the clause.' " *Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys., LLC*, 2003 WL 22595263, *11 n. 14 (N.D.Ill. 2003) (citations omitted). However, as noted before, we need only determine whether the alleged breaches of fiduciary duty constitute "fraud, willful misconduct, or criminal acts"—the express exceptions to the Nonrecourse Provision.

■■■ The only possible exempted category implicated here would be "willful misconduct." [26] As explained above, *Pancakes* discussed "willful misconduct." Other courts have explained that "willful misconduct" is "misconduct committed voluntarily and intentionally." *Vicky M. v. Northeastern Educ. Intermediate Unit 19*, 486 F.Supp.2d 437, 460 (M.D.Pa.2007) (quoting *Black's Law Dictionary* 54 (7th ed.1999)). As *Vicky M.* indicated, willful misconduct involves a conscious indifference to consequences.

[T]he Pennsylvania Supreme Court defined "willful misconduct" to mean that "the actor desired to bring about the result that

followed, or at least that he was aware that it was substantially certain to ensue." It is a step beyond "wanton misconduct," which "means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. *It usually is accompanied by a conscious indifference to the consequences.*"

*Id.* (citations omitted) (emphasis added).

### B.

However, Appellant fails to identify any specific acts committed by Appellees that constitute a breach of fiduciary duty and we thus are only able to analyze the generalized claims raised in the Complaint.[27] Appellant first alleges in the Complaint that Appellees "continued to conceal from and failed to disclose to [Appellant], such material facts regarding maintenance, repair and existing condition of the [Hotel] thereby breaching their fiduciary duties to [Appellant]." There is no indication, even if these general charges are considered true, that Appellees committed such acts "intentionally" or "voluntarily" or that any such action was "accompanied by a conscious indifference to the consequences." *Id.* Thus, no issue of material fact as to the first allegation arises.

The same is true of Appellant's second allegation in the Complaint charging that "[Appellees] breached their fiduciary duties to [Appellant] by concealing and failing to disclose to Aston such material facts regarding maintenance, repair and existing condition of the [Hotel] prior to [Appellant] entering into a long term management agreement with Aston." Once again, there is no accusation that Appellees have "intentionally done

---

**26.** As noted *infra*, Appellant fails to identify any specific acts as to a breach of fiduciary duty. Insofar as "fraud" is concerned, Appellant failed to plead fraud, but giving its pleadings on misrepresentation and non-disclosure liberal reading, the pleadings may be construed as pleading fraudulent inducement. *See supra* note 18. Even then, however, Appellant failed to show fraudulent inducement. *See* discussion *supra*.

**27.** As to the breach of fiduciary duty claim, in the Complaint, Appellant alleges that Appellees became Appellant's agent and that Appellees "con-

tinued to conceal from and failed to disclose to [Appellant], such material facts regarding maintenance, repair and existing condition of the [Hotel] thereby breaching their fiduciary duties to [Appellant.]" Appellant further alleges that "[Appellees] breached their fiduciary duties to [Appellant] by concealing and failing to disclose to Aston such material facts regarding maintenance, repair and existing condition of the [Hotel] prior to [Appellant] entering into a long term management agreement with Aston."

an act of unreasonable character, in disregard of a risk known to him or so obvious that he must have been aware of it, and so great as to make it highly probable that harm would follow." *Id.* (internal quotation marks and citation omitted).

Appellant simply fails to produce cogent facts that first, would speak to a breach of fiduciary duty and second, would implicate willful misconduct. Thus, it appears that Appellant has failed to raise questions of material fact regarding Count II, breach of fiduciary duty. Count V relating to indemnification, hinges on Appellant's breach of fiduciary claim.[28] *See* Opening Brief at 33 n. 74 (stating that "Appellant['s] breach of fiduciary duty (Count II) and indemnity (Count V) claims are tort claims arising out of Appellees' fiduciary relationships with Appellant[ ]"). As such the court's grant of summary judgment based on the Nonrecourse Provision of the Agreement was correct as to Counts II and V relating to breach of fiduciary duty and indemnification.

## XVII.

Because we have concluded that Appellant did not raise any contentions that implicate "fraud," a "criminal act," or "willful misconduct," we hold that Appellant's fiduciary duty claims are precluded by the Nonrecourse Provision.[29] As such we need not address whether Appellees were subagents, and owed fiduciary duties to Appellant.

## XVIII.

As to Appellant's issue (3), Appellant argues that, "[i]n relation to the [court's] May 19, 2005 Orders, for the same reasons set forth above, the [court] should have granted Appellant's motions for reconsideration and partial summary judgment (based upon judicial estoppel)." For the reasons noted

throughout this opinion the court was ultimately correct in denying Appellant's motion for reconsideration because Appellees were entitled to summary judgment on all of Appellant's claims including its argument concerning judicial estoppel.

## XIX.

As to Appellant's issue (4), Appellant argues that "[s]ince the Appellant's claims are the same as Counts I through VI except for a contribution claim, the [court] should have denied Appellees' motion for partial summary judgment upon the Appellant's Third–Party Complaint in C2695." The October 19, 2005 order granted summary judgment in favor of Appellees on the Third–Party Complaint for Count I as to indemnity, Count II as to breach of contract, Count III as to breach of fiduciary duty, Count IV as to misrepresentation, Count V as to nondisclosure, Count VI as to contribution, and Count VII as to punitive damages.

With regard to Counts I, III, and VI regarding indemnity, breach of fiduciary duty, and contribution, respectively, all three claims arise out of Appellant's alleged fiduciary duty claims, and for the reasons noted *supra*, are subject to the Nonrecourse Provision. With regard to Count VII as to punitive damages, Appellant does not present a discernable argument in its opening brief, thus we do not consider this issue. See *supra*.[30]

## XX.

Finally, Appellant maintains that "[a]lthough the [court] granted Appellees' motions based upon the application of the Nonrecourse Provision, Appellees made other erroneous arguments."

---

28. Count V of the Complaint alleges that Appellees "are required by reason of the breaches of fiduciary duties set forth above, to fully and completely indemnify [Appellant] for any damages and costs (including reasonable attorneys' fees) arising out of Appellant's dispute with Aston."

29. As concluded above, there is a public policy against allowing parties to contract out of fraud and willful misconduct. Because here, Appellant did not produce evidence of fraud or willful

misconduct in its breach of fiduciary claim, it is not against public policy to apply the Nonrecourse Provision in favor of Appellees.

30. With regard to Count II as to breach of contract, Count IV as to misrepresentation, and Count V as to nondisclosure, as these claims are the same as those presented in the Complaint, they are resolved by the discussion *supra*.

## A.

First, Appellant states that in "Appellees' December 10, 2004 Memorandum in Support of Motion, Appellees argued that Appellees' liability relates to the Agreement and, therefore, is based upon contract." However, Appellant responds that "[i]n relation to Appellant's purchase of the hotel, Appellees made intentional misrepresentations and intentionally failed to disclose material facts to Appellant and, as a result Appellees are personally liable to Appellant." Appellant cites Restatement of Agency § 348, "Fraud and Duress," which states that an agent can be liable to the injured party even if the tortious conduct of the agent was done on behalf of the principal.[31]

On the other hand, Appellees argue that "[w]hile it is true that an agent may be held individually liable for his own tortious acts, there is an important limitation: the agent must cause physical harm to the third-party or his property." First, Appellees cite Restatement (Second) of Agency § 352 (2006), "Agent's Failure To Perform Duties To Principal; In General," which states that, "[a]n agent is not liable for harm to a person other than his principal because of his failure adequately to perform his duties to his principal, *unless physical harm results from reliance upon performance of the duties by the agent,* or unless the agent has taken control of land or other tangible things." (Emphasis added.)

Comment a. of Restatement (Second) of Agency § 352, states that, "[i]f a person has a cause of action in tort against an agent who has not contracted with him and who holds nothing for him, it is because the agent has caused him harm by conduct which is tortious, and not because of the contractual obligations of the agent to the principal." The title of Restatement of Agency § 352

(Agent's Failure To Perform Duties To Principal) indicates that this section involves an agent's duty to the Principal, whereas Appellant's claim appears to fit the description quoted above from comment a., *i.e.,* those cases involving an agent's tortious conduct directly against a third party. Therefore, Restatement (Second) of Agency § 348 better suits this case, and Appellees' liability for tort is not limited to that which causes physical harm. Further, as noted above, the Nonrecourse Provision would not preclude any of Appellant's claims of intentional misconduct.[32]

## B.

Second, Appellant argues that "Appellees are personally liable to Appellant for Appellees' negligent misrepresentations and failures to disclose material facts to Appellant." This jurisdiction has adopted the Restatement (Second) of Torts § 552 addressing the tort of negligent misrepresentation. *See Kohala Agric. v. Deloitte & Touche,* 86 Hawai'i 301, 304, 949 P.2d 141, 144 (App.1997) (holding that "the tort of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552 ... applies in actions against an accountant for the negligent obtaining and/or communication of information contained in an audit report"); *see also Chun v. Park,* 51 Haw. 462, 468, 462 P.2d 905, 909 (1969) ("We believe § 552 of Restatement (Second) of Torts ... is a fair and just restatement of the law on the issue of negligent misrepresentation"). Restatement (Second) of Torts § 552 (2006) "Information Negligently Supplied For The Guidance Of Others," states that

One who in the course of his business or profession supplies information for the guidance of others in their business trans-

---

**31.** Restatement (Second) Agency § 348 (2006) states that "[a]n agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud occurs in a transaction on behalf of the principal."

**32.** In its reply brief, Appellant argues that the Nonrecourse Provision is inapplicable to its tort

claims. As discussed, *supra,* Appellant's tort claims have no merit as Appellant failed to present any evidence that demonstrated Appellees fraudulently induced Appellant. *See supra.* If Appellant had a valid tort claim, then the Nonrecourse Provision would not apply in cases of intentional misconduct. *See supra.* However, because Appellant has not established a tort claim, this issue is immaterial.

actions is subject to liability for harm caused to them by their reliance upon the information if

(a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

(b) the harm is suffered

 (i) by the person or one of the class of persons for whose guidance the information was supplied, and

 (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.

Appellant maintains that "substantial evidence exists that Appellees engaged in intentional and negligent misrepresentations and nondisclosure." It states that "Appellees were to fully disclose ... to Appellant all information for Appellant to 'fairly evaluate' the Hotel, however Appellees did not disclose such information to Appellant and, in addition, Appellees made misrepresentations to Appellant such as the air conditioning was working fine." Appellant does not attempt to apply the Restatement standard, or any other standard to Appellees' alleged commission of negligent misrepresentation. Thus, viewed in a light most favorable to Appellant, Appellant fails to show that any genuine issue of material fact exists here.

However, assuming *arguendo*, there was sufficient evidence to indicate negligent misrepresentation, such a claim appears to be covered by the Nonrecourse Provision as negligent misrepresentation does not fall under any of the exempted categories of fraud, willful misconduct, or a criminal act. Therefore, Appellant is precluded from seeking recourse against Appellees with regard to negligent misrepresentations.

### C.

Third, Appellant contends that the "As Is" provision, specifically the first sentence of the Nonrecourse Provision which states that "[Appellant] acknowledges that the sale of the Property, including Hotel, is made on an 'AS–IS' basis and without recourse or warranty except those expressly set forth herein[,]" does not provide Appellees with a defense. (Some capitalization omitted.) Appellant maintains that "the 'As Is' Provision ... is expressly subject to the warranties 'expressly set forth herein'" and "[g]iven the warranty of full disclosure contained in Paragraph 6.16 and under the common law, the "As Is" provision ... does not in any way limit Appellees' obligation of full disclosure to Appellant[.]" However, since Appellees do not appear to raise the "As Is" provision as a defense and do not respond to this contention in their answering brief, we need not determine whether the *"AS IS"* provision could have provided a defense for Appellees.

### D.

Fourth, Appellant asserts that because "KSK did not file a motion for summary judgment to enforce the Nonrecourse Provision upon Appellant and, on February 10, 2005, ... filed a 'No Opposition' ... to Appellees' December 10, 2004 Motion.... KSK did not seek to enforce the Nonrecourse Provision upon Appellant." As this is the entirety of Appellant's argument on this point, there is plainly "no discernable argument in support of this contention" and we "disregard this claim." See *Bui,* 104 Hawai'i at 464, 92 P.3d at 473 (internal quotation marks and citation omitted). As noted *supra,* Appellees here seek to hold Appellant to the Nonrecourse Provision which specifically applies to and protects them from liability to Appellant as agents of KSK.

### E.

Finally, in this section, Appellant argues that Appellees acted in bad faith, and are therefore liable to Appellant. However, this court has said that there is no tort of bad faith outside the context of insurance claims. See *Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.,* 107 Hawai'i 423, 438, 114 P.3d 929, 944 (App.2005) ("[T]he Supreme Court expressly stated that it was unaware of any

authority recognizing a 'tortious bad faith' cause of action beyond the insurance context." (Citing *Hokama v. Univ. of Hawai'i,* 92 Hawai'i 268, 273, 990 P.2d 1150, 1155 (1999).)). Because Appellant's claims do not arise in the insurance context, Appellant is precluded from bringing a claim of bad faith.

## XXI.

Accordingly, the November 14, 2005 judgment of the court is affirmed.