**Electronically Filed
Supreme Court
SCWC-15-0000309
21-JAN-2020
11:13 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

AMERICAN SAVINGS BANK, F.S.B., a federal savings bank,
Respondent/Plaintiff-Appellee,

vs.

JOHNNY KINMAN CHAN; JEAN TOSHIKO CHAN; DIRECTOR OF TAXATION,
STATE OF HAWAI'I; CAPITAL ONE BANK (USA) N.A.; HAWAI'I HOUSING
FINANCE AND DEVELOPMENT CORPORATION, a Public Body and Corporate
Politic, Respondents/Defendants-Appellees,

and

VILALGES OF KAPOLEI ASSOCIATION (incorrectly identified in the
caption as ASSOCATION OF APARTMENT OWNERS OF THE VILALGES OF
KAPOLEI), Petitioner/Defendant-Appellant.

(SCWC-15-0000309; CAAP-15-0000309; CIVIL NO. 13-1-0944)
_____

VILLAGES OF KAPOLEI ASSOCIATION, a Hawai'i non-profit
corporation, Petitioner/Plaintiff-Appellant,

vs.

JOHNNY KINMAN CHAN, JEAN TOSHIKO CHAN; FIRST BANK NATIONAL
ASSOCIATION; DEPARTMENT OF TAXATION, STATE OF HAWAI'I; CAPITAL
ONE BANK (USA) N.A.; HAWAI'I HOUSING FINANCE AND DEVELOPMENT
CORPORATION, a Public Body and Body Corporate and Politic,
Respondents/Defendants-Cross-Claim Defendants-Appellees,

and

AMERICAN SAVINGS BANK, F.S.B., a federal savings bank,
Respondent/Defendant-Cross-Claimant-Appellee.

(SCWC-15-0000395; CAAP-15-0000395; CIVIL NO. 12-1-2466)

_____

SCWC-15-0000309

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS

JANUARY 21, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.   Introduction

This certiorari proceeding arises from two cases filed and
consolidated in the Circuit Court of the First Circuit ("circuit
court") concerning a foreclosure dispute between the Villages of
Kapolei Association ("Association"), the Hawaiʻi Housing Finance
and Development Corporation ("HHFDC"), Johnny Kinman Chan and
Jean Toshiko Chan ("Chans"), and American Savings Bank, F.S.B.
("ASB").  The dispute concerns the circuit court's determination
of lien priority between the Association's and HHFDC's competing
liens and the valuation of HHFDC's senior lien.  The underlying
foreclosure of ASB's first mortgage lien is not in dispute.

The Association's application for writ of certiorari
("Application") raises three issues.  First, the Association
contends the Intermediate Court of Appeals ("ICA") erred by
affirming the circuit court's alleged retroactive application of
Hawaiʻi Revised Statutes ("HRS") § 201H-47 (Supp. 2009) to rule

2

that HHFDC's lien was senior and superior to the Association's liens. We hold that the ICA did not err because (1) whether the circuit court actually applied HRS § 201H-47 was unclear; (2) HHFDC had lien priority over the Association's liens pursuant to HRS § 201E-221 (repealed 1997), the statute in effect when the deed and Shared Appreciation or Equity ("SAE") Agreement between the Chans and HHFDC's predecessor-in-interest, the Housing Finance and Development Corporation ("HFDC") were entered; and (3) HHFDC had lien priority over the Association pursuant to the "first in time, first in right" principle and the SAE Agreement, which was incorporated into the deed.

Second, the Association asserts the ICA erred by ignoring the plain language of Sections 1, 2, 3, and 7 of the SAE Agreement relating to the applicability of the agreement's appraisal process and whether the SAE Agreement became null and void upon ASB's foreclosure. We hold the ICA did not err in determining the appraisal process applied and that ASB's foreclosure did not nullify the SAE Agreement.

Third, the Association argues the ICA erred by holding that HHFDC had rights under the SAE Agreement because there were genuine issues of material fact regarding HHFDC's standing to enforce the agreement. We hold that, as a matter of law, HHFDC had standing to enforce the SAE Agreement as successor to HFDC

3

pursuant to Act 350 of 1997 and Act 196 of 2005.  1997 Haw. Sess. Laws Act 350; 2005 Haw. Sess. Laws Act 196.

We therefore affirm the ICA's August 20, 2019 judgment on appeal.

## II.  Background

### A.  Factual Background

#### 1.  History of HHFDC

Act 337 of 1987 established HFDC to promote affordable housing.  1987 Haw. Sess. Laws Act 337, § 15 (§-5) at 1049 (codified at HRS ch. 201E (repealed 1997)).  Act 350 of 1997 combined HFDC with the Hawai'i Housing Authority and Rental Housing Trust Fund to create the Housing and Community Development Corporation of Hawai'i ("HCDCH").  1997 Haw. Sess. Laws Act 350, § 2 (§-2) at 1013 (codified at HRS ch. 201G (repealed 2006)).  Act 350 stated that HCDCH would "succeed to all of the rights and powers previously exercised" by HFDC, and that "[a]ll deeds, leases, contracts . . . or other documents executed or entered into by or on behalf of [HFDC] . . . shall remain in full force and effect."  Act 350, § 20 at 1091.

Act 196 of 2005 split HCDCH into the Hawai'i Public Housing Administration and HHFDC.  2005 Haw. Sess. Laws Act 196, § 19 at 620 (codified at HRS ch. 201H (Supp. 2005)).  Act 196 transferred "[a]ll rights, powers, functions, and duties of [HCDCH]" relating to state housing and financing programs to

HHFDC.  § 22 at 631.  Act 196 also stated that "[a]ll deeds, leases, contracts . . . or other documents executed or entered into by or on behalf of [HCDCH] or [HFDC] . . . which are made applicable to [HHFDC] by this Act, shall remain in full force and effect."  § 25 at 632.

### 2.    The Chans purchase the Villages of Kapolei property

On June 6, 1991, the Chans purchased a house ("Property") in the Villages of Kapolei, a planned affordable housing community created by HFDC.  The Chans purchased the Property through HFDC's SAE Program, which allowed participants to purchase a home at a discounted price in exchange for an agreement ("SAE Agreement") granting HFDC a share of the appreciation of the home's equity ("Net Appreciation") if the property were ever sold or transferred.[1]

---

[1]    Section 1.F of the SAE Agreement defined "Net Appreciation" as:

> Fair Market Value of the Property
>
> <u>minus</u> Grantee's Original Purchase Price
>
> <u>minus</u> The amount obtained by multiplying the following fraction:
>
> Fair Market Value of the Property divided by Actual Sale Price by the sum of the following sales and closing expenses which the Grantee actually pays in the case of a bona fide arm's length sale (<u>but not including a foreclosure sale</u>) of the Property: (i) escrow fees, (ii) title report fees (not including any title insurance premiums), (iii) drafting of conveyance documents, (iv) conveyance taxes, (v) notary fees, (vi) recording fees and (vii) real estate commissions.  (The foregoing fraction shall not exceed a value of "1".)

(continued. . .)

Section 2 of the SAE Agreement outlined when HFDC would be entitled to its share of the Net Appreciation value and how HFDC's share would be calculated:

> Except for a "Permitted Transfer", as that term is defined below, the Grantee promises and agrees that if and when all or any part of or interest in the Property is sold or transferred or if the Grantee shall be divested of title or any interest in the Property, in any manner, voluntarily or involuntarily, <u>including a judicial or nonjudicial foreclosure sale</u>, HFDC will immediately be entitled to a share of the Net Appreciation equal to:

> HFDC's Percentage Share[2] x Net Appreciation

The SAE Agreement was incorporated into the Chans' deed, which was recorded in Land Court on June 12, 1991.

The Chans financed their purchase of the Property through a $111,896 loan secured by a June 6, 1991 mortgage to ASB. Section 7 of the SAE Agreement, titled "First Mortgage Protection," granted ASB's mortgage priority over HFDC's liens in the event of foreclosure. Section 7 also provided that "any person who acquires legal title to the Property as a result of foreclosure" would acquire title free of HFDC's liens, and that

---

(. . .continued)

Section 1.E of the SAE Agreement defined "Fair Market Value" as "the fair market value of the Property as determined by an appraisal obtained and performed in the manner described below in Section 3. if and when the Grantee subsequently sells or transfers the Property."

Because this case involved a foreclosure sale, the "amount obtained by multiplying the following fraction" was zero. (Fair Market Value / Actual Sale Price x 0 = 0) Therefore, the Net Appreciation equaled the Fair Market Value of the Property minus the Grantee's Original Purchase Price.

[2] Section 1.C of the SAE Agreement provided that HFDC's Percentage Share was 62% and was calculated by subtracting the Chans' original purchase price of the Property ($111,400) from the Property's original fair market value ($296,400), then dividing the total by the original fair market value ($296,400) and rounding to the nearest percent.

the SAE Agreement would be "null and void upon a conveyance of the Property through a foreclosure sale . . . ."

Upon signing the deed, the Chans also agreed to the Association's Declaration of Covenants, Conditions, and Restrictions ("Covenants"). On November 14, 2006, the Association recorded a $26,687.30 judgment lien against the Property in Land Court for the Chans' failure to adhere to landscaping requirements in violation of the Covenants. On September 5, 2012, the Association filed a $5,763.66 lien against the Property in Land Court because the Chans failed to pay for maintenance assessments in violation of the Covenants.

On December 3, 2012, ASB sent the Chans a notice of default demanding payment on the mortgage.

## B. Circuit Court Proceedings

On October 1, 2012, the Association filed a complaint for foreclosure. On March 28, 2013, ASB filed a complaint for foreclosure alleging the Chans had defaulted on the loan and mortgage, and that the mortgage was the "valid first lien upon the property . . . ." ASB's complaint named the Association as a defendant, and HHFDC was later identified and made a party defendant.[3]

---

[3] The Association and ASB's complaints named the Chans as defendants. The circuit court entered default against the Chans for failure to respond to both complains. The Director of Taxation for the State of Hawai'i and Capital
(continued. . .)

On September 20, 2013, ASB filed a motion for summary judgment. The parties stipulated to consolidate the ASB and the Association foreclosure actions. The circuit court granted ASB's motion and entered a Hawai'i Rules of Civil Procedure ("HRCP") Rule 54(b) judgment on May 12, 2014.[4]

On April 22, 2014, HHFDC filed a motion for summary judgment ("HHFDC's motion for summary judgment"), arguing that its lien was senior and superior to all other liens except ASB's under the "first in time, first in right" principle. HHFDC asserted it had assumed HFDC's rights under the deed by statute. HHFDC contended that HRS § 201H-47(e)[5] entitled HHRDC to its Net Appreciation share when a foreclosure action is filed, and that the SAE lien was a covenant running with the land under HRS § 201H-47(a)(6). HHFDC asserted its Net Appreciation share was $244,032, and it attached a copy of a November 2013

---

(. . .continued)
One Bank (USA), N.A. were also named as defendants. However, these defendants are not actively involved in the current appeal.

[4]    The Honorable Judge Bert I. Ayabe presided.

[5]    HRS § 201H-47(e) (Supp. 2009) (amended 2018) read, in relevant part:

> The restrictions prescribed in this section . . . shall be automatically extinguished and shall not attach in subsequent transfers of title when a mortgage holder or other party becomes the owner of the real property pursuant to a mortgage foreclosure, foreclosure under power of sale, or conveyance in lieu of foreclosure after a foreclosure action is commenced; provided that the mortgage is the initial purchase money mortgage . . . . The corporation shall be a party to any foreclosure action, and shall be entitled to its share of appreciation in the real property as determined under this chapter in lien priority when the payment is applicable . . . .

appraisal prepared by Appraiser Kathy Ann Oshiro ("Appraiser Oshiro") valuing the Property at $505,000.

The Association opposed HHFDC's motion for summary judgment, arguing that "HHFDC had based almost its entire argument on HRS § 201H-47," which was not retroactive, and that any retroactive application of HRS § 201H-47 would unconstitutionally impair the Association's vested rights. The Association contended that, under Section 7, HHFDC's SAE Agreement rights were extinguished when ASB foreclosed on its mortgage.[6] The Association also argued that, even if HHFDC had

---

[6]    Section 7 of the SAE Agreement provides:

   FIRST MORTGAGE PROTECTION

   The foregoing provisions shall not apply with respect to:

   (a)   The first purchase money mortgage ("First Mortgage"), if any, which is being placed on the Property.
   (b)   The first purchase money mortgagee ("First Mortgagee") named in the First Mortgage, including the first purchase money mortgagee's successors and assigns.
   (c)   The rights of the First Mortgagee to foreclose or take title pursuant to the remedies in the First Mortgage, to accept a deed in lieu of foreclosure in the event of default by the Grantee, as mortgagor under the First Mortgage, or to sell or lease the Property acquired by the First Mortgagee.
   (d)   Any Person or persons acquiring the Property as a result of foreclosure or by a deed in lieu of foreclosure of the First Mortgage or any successor, transferee, or assignee of such person or persons.
   . . . .
   HFDC specifically subordinates any lien or contingent lien rights that HFDC may have under this Exhibit C to the lien of the First Mortgage. Any holder of the First Mortgage or any person who acquires legal title to the Property as a result of a foreclosure or a deed in lieu of foreclosure of
                                        (continued. . .)

an interest in the SAE Agreement, the agreement limited HHFDC's interest to the proceeds the Chans would "realize" from the transfer or sale of the Property[7] — "[i]n other words, HHFDC would recover from the proceeds remaining after payment of all liens and encumbrances." The Association maintained that HHFDC did not comply with Section 3 of the SAE Agreement because Appraiser Oshiro was not sufficiently qualified to appraise the Property and HHFDC had not timely notified the Chans of the appraisal. Finally, the Association contended that HHFDC lacked standing to foreclose because neither Act 180 nor Act 196 stated that HHFDC had assumed the Chan deed.

On September 23, 2014, the day before a hearing on HHFDC's motion for summary judgment, HHFDC filed an updated appraisal (the "September Appraisal") prepared by Appraiser Oshiro, this time under the supervision of an appraiser who was sufficiently

---

(. . .continued)
> the First Mortgage shall acquire legal title free of such lien or contingent lien rights that HFDC may have under this Exhibit C. This Exhibit C shall be null and void upon a conveyance of the Property through a foreclosure sale or a deed in lieu of foreclosure.

(Emphasis added.)

[7] The SAE Agreement provides, in relevant part: "Under the Program, which is described in this Exhibit C, the Grantee agrees to pay to HFDC a share of the "Net Appreciation" which the Grantee realizes or is deemed to have realized upon the sale or transfer of the Property . . . ."
The SAE Agreement did not define the meaning of "realizes or is deemed to have realized." Black's Law Dictionary defines "realization" as: "Conversion of noncash assets into cash assets." Realization, Black's Law Dictionary (11th ed. 2019).

qualified under the SAE Agreement.  The September Appraisal claimed the current fair market value of the Property was $480,000 and that HHFDC's Net Appreciation share was $228,532.[8]

On December 9, 2014, ASB filed a motion for confirmation of sale, asking the circuit court to determine the priority of the parties' claims and the amount of HHFDC's claim.  On January 15, 2015, a hearing was held on ASB's motion for confirmation of sale at which bidding was reopened, and the Association purchased the Property for $370,000.  The Association argued that the Property's fair market value should equal the $370,000 purchase price.

On March 4, 2015, the circuit court entered an order granting HHFDC's motion for summary judgment ("order granting HHFDC's motion for summary judgment"), ruling that HHFDC's lien was senior and superior to the Association's.  On the same day, the court entered an order granting ASB's motion for confirmation of sale ("order confirming sale") and judgment on the order ("March 4, 2015 judgment").[9]

---

[8]    HHFDC determined that the Net Appreciation of the Property was $368,600 by subtracting the Chans' original purchase price ($111,400) from the September Appraisal's fair market value ($480,000).  HHFDC then determined its Net Appreciation share was $228,532 by multiplying its percentage share (62%) by the Net Appreciation ($368,600).

[9]    The March 4, 2015 judgment appears to mistakenly refer to the order granting ASB's motion for summary judgment.  However, the March 4, 2015 Judgment provides the hearing date for ASB's motion for confirmation of sale. Furthermore, the order granting ASB's motion for summary judgment and corresponding judgment were entered on May 12, 2014.

On March 9, 2015, the circuit court filed a minute order concluding the fair market value of the Property was $480,000 and that HHFDC's Net Appreciation value was $228,532.

On March 25, 2015, HHFDC submitted a proposed further order regarding ASB's motion for confirmation of sale ("further order re: confirmation of sale") stating that $480,000 was the fair market value of the Property and that HHFDC's Net Appreciation value was $228,532. On April 2, 2015, the Association appealed under CAAP-15-0000309 the order granting HHFDC's motion for summary judgment, order confirming sale, the March 4, 2015 judgment, and the proposed further order re: confirmation of sale, which the court had not yet entered.

On April 16, 2015, the circuit court entered judgment on the order granting HHFDC's motion for summary judgment ("judgment on order granting HHFDC's motion for summary judgment"). On April 17, 2015, the circuit court entered the further order re: confirmation of sale. The Association filed a motion for reconsideration of the further order re: confirmation of sale on April 27, 2015 ("motion for reconsideration").[10]

On May 7, 2015, the Association appealed under CAAP-15-

---

[10] According to the Association, as of the filing of its opening brief on September 8, 2015, the circuit court had "not disposed of the Motion for Reconsideration and it is therefore deemed denied pursuant to Hawaiʻi Rules of Appellate Procedure ("HRAP") Rule 4(a)(3)."

0000395 the further order re: confirmation of sale and judgment on order granting HHFDC's motion for summary judgment.

On June 4, 2015, the ICA consolidated the Association's appeals under CAAP-15-0000309.

## C.   ICA Proceedings

### 1.   The Association's Arguments

On appeal to the ICA, the Association repeated the arguments in its opposition to HHFDC's motion for summary judgment.

Additionally, the Association argued that, if HHFDC had a valid lien, HHFDC impermissibly used the Section 3 appraisal process to determine the Property's fair market value because the appraisal process applied only if the Chans "sell or transfer" the Property.  The Association asserted that Section 2 of the SAE Agreement distinguished a "sale or transfer" from foreclosures, and therefore a foreclosure could not trigger the appraisal process.[11]  The Association argued the circuit court

_____

[11]    Section 2 of the SAE Agreement outlined three situations in which "[a] sale or transfer of the Property will be deemed to have taken place[:]"

> (a) When the Grantee sells or transfers the Property or any legal or beneficial right, title  or ownership interest in the Property, including by way of an agreement of sale or a lease with an option to purchase the Property;
> (b) When the Grantee no longer uses the Property as Grantee's principal residence but continues to retain legal and/or equitable title to the Property; or
> (c) When the Grantee rents the Property or any part of the Property to someone else but continues to retain legal and/or equitable title to the Property.

13

should have used the foreclosure sale price as the Property's fair market value.

The Association argued the circuit court erred in granting HHFDC's motion for summary judgment because genuine issues of material fact existed regarding HHFDC's calculation of the Net Appreciation, the Property's fair market value, and HHFDC's failure to comply with Section 3's appraisal process. The Association additionally argued the circuit court erred by denying its motion for reconsideration because the Association did not have the opportunity to review the September Appraisal before the motion for summary judgment hearing.

### 2. HHFDC's Arguments

HHFDC also repeated its arguments below. In addition, HHFDC asserted that the circuit court did not need to rely on HRS chapter 201H to determine the validity or priority of HHFDC's lien, which was established by the deed and SAE Agreement.

HHFDC argued the appraisal process applied because the SAE Agreement provided that HFDC would "immediately be entitled to a share of the Net Appreciation" if the Property were ever "sold or transferred . . . in any manner, voluntarily or involuntarily, including a judicial or nonjudicial foreclosure sale." The agreement also provided that HFDC would select an

14

appraiser to determine the fair market value "[w]henever it shall become necessary to determine the Net Appreciation . . . ." Therefore, the appraisal process was triggered when HHFDC became entitled to its Net Appreciation share upon foreclosure because it was "necessary to determine the Net Appreciation" to calculate HHFDC's share. HHFDC also maintained that the Property's fair market value was $480,000 based on the September Appraisal.

HHFDC asserted the foreclosure sale was a "sale" entitling HHFDC to its Net Appreciation share because, under Section 2, if the Chans were "divested of title . . . in any manner, voluntarily or involuntarily, including a judicial or nonjudicial foreclosure sale, HFDC [would] immediately be entitled to a share of the Net Appreciation." HHFDC also contended that, reading the SAE Agreement as a whole, Section 7 only nullified the agreement as to the purchaser acquiring the Property as a result of a foreclosure. Finally, HHFDC claimed the circuit court properly granted summary judgment because the issues of HHFDC's Net Appreciation share, the Property's fair market value, and HHFDC's compliance with the appraisal process were not material as to the validity and priority of HHFDC's lien.

### 3. Memorandum Opinion

On July 26, 2019, the ICA issued its memorandum opinion. American Savings Bank, F.S.B. v. Chan, Nos. CAAP-15-0000309 & CAAP-15-0000395 (App. July 26, 2019) (mem.). In addressing the Association's argument that the circuit court retroactively applied HRS chapter 201H in granting summary judgment, the ICA noted the circuit court's reliance on HRS chapter 201H was unclear because the circuit court did not provide the basis for its ruling. Chan, mem. op. at 8-9. The ICA determined that the "first in time, first in right" principle and the dates HFDC and the Association had filed and perfected their liens were "all the Circuit Court needed to rely on in determining lien priority." Chan, mem. op. at 9-10. Therefore, the ICA concluded the Association's retroactivity argument was without merit. Chan, mem. op. at 11.

The ICA then considered the Association's argument that the circuit court had disregarded the express language of Section 7 of the SAE Agreement. Id. Reading the SAE Agreement as a whole, the ICA determined that the Association's interpretation that Section 7 extinguished HHFDC's rights upon foreclosure of the first mortgage was "against the clear purpose and effect of Section 7" to protect the first mortgagee and the parties that acquired the Property as a result of foreclosure. Chan, mem. op. at 15.

16

Next, the ICA turned to the Association's argument that the circuit court erred by not using the Property's $370,000 sale price as its fair market value. Chan, mem. op. at 16. While the ICA recognized that courts may generally consider the foreclosure sale price in determining fair market value, the ICA did "not agree that Sections 1.E, 2, and 3 together require that the foreclosure sale price must be used in calculating Net Appreciation." Chan, mem. op. at 17. The ICA also concluded that, reading Sections 1.E, 2, and 3 together, the appraisal process applied to foreclosure sales. Id.

The ICA held, however, that HHFDC failed to comply with the Section 3 appraisal process because Appraiser Oshiro was not sufficiently qualified and HHFDC did not timely mail the September Appraisal to the Chans. Chan, mem. op. at 17-18. The ICA concluded the circuit court "erred to the extent that it utilized the HHFDC's appraised value of the Property without confirming the validity of the appraisal process or otherwise determining that the fair market value of the Property was $480,000 independent of the HHFDC appraisal." Chan, mem. op. at 18-19. The ICA vacated the circuit court's determination of HHFDC's Net Appreciation value and remanded for further proceedings. Chan, mem. op. at 19.

Because the ICA vacated the circuit court's findings related to the Property's fair market value, the ICA did not

17

address the Association's argument that the circuit court erred by considering new evidence and by not granting the Association's Motion for Reconsideration. Id. The ICA did not address whether HHFDC's share was limited to the amount the Chans "realized" from the foreclosure sale.

The ICA then addressed the Association's argument that the circuit court erred in finding that HHFDC was HFDC's successor to the SAE Agreement. Chan, mem. op. at 19-20. The ICA noted that Act 350 transferred HFDC's rights to HCDCH and provided that all deeds entered into by HFDC would remain "in full force and effect." Chan, mem. op. at 21; 1997 Haw. Sess. Laws Act 350, §20 at 1091. Act 196 then split HCDCH into HHFDC and another entity, and provided that HHFDC would "perform the functions of housing financing and development." Chan, mem. op. at 21; 2005 Haw. Sess. Laws Act 196, § 19 at 620. The ICA held that the circuit court did not err because HHFDC had assumed HCDCH's rights "including those arising out of the Deed and SAE Agreement," and Act 196 and Act 350 "suggest[ed] that HHFDC is HFDC's successor in interest." Chan, mem. op. at 21.

Finally, the ICA addressed the Association's argument that the circuit court erred in granting summary judgment because genuine issues of material fact existed regarding the appraisal process and value of HHFDC's lien. Chan, mem. op. at 21-22. The ICA noted that the circuit court only determined HHFDC's

18

lien priority on summary judgment. Chan, mem. op. at 22. The ICA then reasoned that the facts relating to the appraisal process and value of HHFDC's lien were not material because they did not establish or refute HHFDC's lien validity or priority. Id. Therefore, the circuit court did not err in granting HHFDC's motion for summary judgment. Id.

The ICA affirmed the order granting HHFDC's motion for summary judgment, order confirming sale, March 4, 2015 judgment, and judgment on order granting HHFDC's motion for summary judgment. Chan, mem. op. at 22-23. However, the ICA vacated the further order re: confirmation of sale "to the extent that it relates to the value of HHFDC's interest" and remanded for further proceedings. Chan, mem. op. at 23.

The ICA entered its judgment on appeal on August 20, 2019.

## D. Application for Certiorari

The Association's Application presents three questions:

> [1.] Did the ICA commit grave errors of law and fact by failing to find that the Circuit Court erred in retroactively applying [HRS] Chapter 201H, including HRS §§ 201H-47(a)(6) and 201H-47(e), when if found that HHFDC had a lien in foreclosure and that such lien was senior and superior to liens of all other parties except for a first mortgage lien?
> [2.] Did the ICA commit grave errors of law and fact when it ignored the plain language of [SAE Agreement], including, without limitation, Sections 2, 3, 4, and 7?
> . . . .
> [3.] Did the ICA commit grave errors of law and fact when it failed to hold HHFDC to the same burden of proof that this Court has required of lenders in foreclosure actions and granted summary judgment to HHFDC when there were genuine issues of material fact regarding HHFDC's standing and authority to enforce the SAE Agreement?

19

First, the Association argues that HRS § 201H-47(e) was not retroactive, that the law in effect when the deed was recorded in 1991 was HRS § 201E-221(c), and that under HRS § 201E-221(c), HFDC would only be entitled to the foreclosure proceeds remaining after payment of all liens and encumbrances, including the Association's liens.

Second, the Association argues the ICA ignored the express language of the SAE Agreement because: (1) Section 7 voided the agreement upon the foreclosure of ASB's mortgage; (2) the Section 3 appraisal process did not apply because no "sale or transfer" occurred as defined by Section 1.E; and (3) the agreement limited HHFDC's entitlement "to amounts the Chans received by converting the Property into cash 'upon the sale or transfer of the Property.'"

Third, the Association argues HHFDC lacked standing to enforce the SAE Agreement as HFDC's successor.  The Association also argues that the powers, functions, and duties transferred to HHFDC by Act 196 were under HRS chapter 201G, while the Chan deed was made under HRS chapter 201E.  It argues that, therefore, there was a genuine issue of material fact as to whether HHFDC was HFDC's successor.

### III. Standards of Review

**A. Contract Interpretation**

In <u>Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. Partnership</u>, 115 Hawai'i 201, 166 P.3d 961 (2007), the Hawai'i Supreme Court stated:

> When reviewing the court's interpretation of a contract, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court.
>
> . . . .
>
> This court has determined that it is fundamental that terms of contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning. Further, in construing a contract, a court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety. If there is any doubt, the interpretation which most reasonably reflects the intent of the parties must be chosen.

115 Hawai'i at 213, 166 P.3d at 973 (internal quotation marks, citations, and brackets omitted).

**B. Statutory Interpretation**

> The interpretation of a statute is a question of law reviewable de novo.
>
> > When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

<u>Ka Pa'akai O Ka'aina v. Land Use Comm'n</u>, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000) (internal quotation marks and citations omitted) (quoting <u>Amantiad v. Odum</u>, 90 Hawai'i 152, 160, 977 P.2d 160, 168-69 (1999)).

21

## IV. Discussion

**A. The ICA did not err in finding HHFDC's lien senior and superior to the Association's**

The Association argues the ICA erred by failing to find the circuit court erred in retroactively applying HRS chapter 201H when it concluded HHFDC's lien was senior and superior to the Association's, and that HRS § 201E-221(c), the law in effect when the deed and SAE Agreement were entered, entitled HHFDC only to the foreclosure proceeds remaining after payment of all liens and encumbrances.

While the circuit court did not state the basis of its summary judgment ruling, HHFDC's lien was senior and superior to the Association's even under HRS § 201E-221. HRS § 201E-221(c) provided, in relevant part: "The corporation shall be a party to any foreclosure action, and shall be entitled to all proceeds remaining in excess of all customary and actual costs and expenses of transfer pursuant to default, including liens and encumbrances of record . . . ." HHFDC's SAE interest was a "lien[] and encumbrance[] of record" required to be paid upon foreclosure under HRS § 201E-221(c), and because HHFDC's lien was filed before the Association's liens, HHFDC's lien had priority under the "first in time, first in right" principle. See HRS § 501-82 (2006); HRS § 502-83 (2006) (establishing Hawai'i as a race-notice jurisdiction). Furthermore, the SAE

22

Agreement, which was entered into pursuant to HRS chapter 201E, provided that HFDC would become entitled to its Net Appreciation share upon foreclosure and only subordinated HFDC's interest to the first mortgagee (ASB).  Therefore, the ICA did not err in affirming the circuit court's determination of lien priority. See Strouss v. Simmons, 66 Haw. 32, 40, 657 P.2d 1004, 1010 (1982) ("An appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance.").

**B.    The ICA did not ignore the plain language of the SAE Agreement**

**1.    The ICA did not ignore the plain language of Section 7**

The Association argues the ICA ignored the plain language of Section 7 of the SAE Agreement because the last sentence of Section 7, "[t]his Exhibit C shall be null and void upon a conveyance of the Property through a foreclosure sale or a deed in lieu of foreclosure," meant that the foreclosure of ASB's first mortgage voided the SAE Agreement.

However, as the ICA reasoned, Section 7's "purpose and effect" was to protect the first mortgagee and those who acquired the Property through foreclosure.  Chan, mem. op. at 15.  Section 7 is titled "First Mortgage Protection," and the first part of the section specified that the "foregoing provisions shall not apply with respect to" the first purchase money mortgage, the first purchase money mortgagee, the rights

of the first mortgagee to foreclose, and "[a]ny person or persons acquiring the Property as a result of foreclosure . . . ."  Thus, the ICA did not err in determining that Section 7 did not nullify the SAE Agreement upon ASB's foreclosure.

**2.   The Section 3 appraisal process applied**

The Association also maintains that the Section 3 appraisal process did not apply because, under Section 1.E of the SAE Agreement, an appraisal of the Property's "fair market value" is contingent upon a "sale or transfer," and a foreclosure sale is not a "sale or transfer" as defined by Section 2.

Section 2 of the SAE Agreement described three situations in which "[a] sale or transfer of the Property will be deemed to have taken place[:]"

> (a) When the Grantee sells or transfers the Property or any legal or beneficial right, title or ownership interest in the Property, including by way of an agreement of sale or a lease with an option to purchase the Property;
> (b) When the Grantee no longer uses the Property as Grantee's principal residence but continues to retain legal and/or equitable title to the Property; or
> (c) When the Grantee rents the Property or any part of the Property to someone else but continues to retain legal and/or equitable title to the Property.

Section 2, however, did not limit a "sale or transfer" to these scenarios.  Neither did Section 1, which defines the agreement's terminology, define "sale or transfer."  Therefore, we interpret the words "sale or transfer" "according to their plain, ordinary and accepted use in common speech," which would include a

24

foreclosure sale. Laeroc Waikiki Parkside, LLC, 115 Hawai'i at 213, 166 P.3d at 973.

Furthermore, Section 3 of the SAE Agreement provided, in relevant part, "[w]henever it shall become necessary to determine the Net Appreciation, HFDC will select an independent appraiser . . . who shall prepare a written appraisal of the Fair Market Value of the Property . . . ." Under Section 2, HFDC would be entitled to its Net Appreciation share "when all or any part of or interest in the Property is sold or transferred . . . including a judicial or nonjudicial foreclosure sale . . . ." Because a foreclosure sale would make it "necessary to determine the Net Appreciation," the ICA did not err in holding that the Section 3 appraisal process applied.

### 3. HHFDC's entitlement under the SAE Agreement is not limited to the amount the Chans "realized"

The Association argues HHFDC's recovery under the SAE Agreement was "limited to the funds remaining after payment of all liens and encumbrances." Although the ICA did not address this argument in its memorandum opinion, the Association's argument is without merit. The Association essentially argues that the parties to the SAE Agreement intended to make HFDC's lien junior and subordinate to all other liens. This interpretation of the agreement does not reasonably reflect the intent of the parties. See Laeroc Waikiki Parkside, LLC, 115

Hawai'i at 213, 166 P.3d at 973. Section 7 of the SAE Agreement specifically subordinated HFDC's lien to the first mortgagee's lien. If, as the Association argues, HHFDC's recovery were "limited to the funds remaining after payment of all liens and encumbrances," Section 7 would not need to exist. Therefore, considering the likely intent of the parties and the SAE Agreement as a whole, the Association's argument is without merit.

**C. The ICA did not err in finding HHFDC had standing to enforce the SAE Agreement**

The Association argues there were "genuine issues of material fact as to whether [HHFDC] was the successor to HFDC and whether it assumed the rights of HFDC under the SAE Agreement."

While the Association argues that HHFDC's standing is a genuine issue of material fact, it is actually a question of law; HHFDC asserts that it assumed HFDC's rights to the SAE Agreement by statute. Therefore, we review the ICA's determination that HHFDC is HHFDC's successor in interest to the SAE Agreement pursuant to Act 196 and Act 350 de novo. Chan, mem. op. at 21; see Ka Pa'akai O Ka'aina, 94 Hawai'i at 41, 7 P.3d at 1078 ("The interpretation of a statute is a question of law reviewable de novo.").

HHFDC is HFDC's successor according to the language of Act 350 and Act 196.  Act 350 of 1997 created HFDCH, stating that HFDCH "shall succeed to all of the rights and powers previously executed" by HFDC, and that "[a]ll deeds, leases, contracts . . . or other documents executed or entered into by or on behalf of [HFDC] . . . shall remain in full force and effect." § 20 at 1091.  Act 350 also repealed HRS chapter 201E, which was replaced with HRS chapter 201G.  § 18 at 1090; HRS chapter 201G (Supp. 1997).  According to the "Table of Derivation" in the HRS 2005 Supplement, HRS § 201E-221, which governed the SAE Program, was replaced by HRS § 201G-127.

Act 196 of 2005 split HFDCH into the Hawai'i Public Housing Administration and HHFDC.  § 19 at 620.  Act 196 transferred HFDCH's functions relating to financing and state housing programs under HRS chapter 201G part II subpart F and HRS chapter 201G part III except subparts D and M to HHFDC.  § 21 at 630-31.  In the HRS 2005 Supplement, HRS § 201G-127 was under part II subpart F of HRS chapter 201G — one of the subparts transferred to HHFDC.  Act 196 also transferred all records and contracts "made, used, acquired, or held by [HFDCH] relating to the functions transferred to [HHFDC]."  § 23 at 631.  The act provided that "[a]ll deeds, leases, contracts . . . or other documents executed or entered into by or on behalf of [HFDCH] . . . which are made applicable to [HHFDC] by this Act, shall

remain in full force and effect."  § 25 at 632.  Finally, the act amended references to HCDCH to refer to HHFDC.  § 26 at 632.

Reading Act 350 and Act 196 together, the legislature intended for HHFDC to succeed HFDCH and HFDC's SAE Program interests.  See Ka Pa'akai O Ka'aina, 94 Hawai'i at 41, 7 P.3d at 1078 ("When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.").  Because Act 196 transferred HFDCH's functions under HRS § 201G-127, which governed the SAE Program in 2005, to HHFDC, the SAE Agreement was "made applicable" to HHFDC by Act 196 and remained "in full force and effect."  Therefore, HHFDC is HFDC's successor to the SAE Agreement, and the ICA did not err in affirming the circuit court's grant of HHFDC's motion for summary judgment.

## V.   Conclusion

We therefore affirm the ICA's August 20, 2019 judgment on appeal.

| | |
|---|---|
| M. Anne Anderson and Paul A. Ireland Koftinow For Petitioner/Defendant-Appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| Craig Y. Iha, Sandra A. Ching, and Matthew S. Dvonch for Respondent/Defendant-Appellee | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



28